**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. **22-CR-60101-CANNON/REINHART**

**UNITED STATES OF AMERICA**

vs.

**JUAN GUILLERMO GONZALEZ,**

**Defendant.**

_____/

**PLEA AGREEMENT**

The United States of America, by and through the undersigned Assistant United States Attorney (hereinafter referred to as "this Office"), and Juan Guillermo Gonzalez (hereinafter referred to as the "Defendant"), enter into the following agreement:

1.      The Defendant agrees to plead guilty to the Information.  The Information charges that the Defendant knowingly and willfully aided and abetted others to intentionally access a computer without authorization and thereby obtain information from departments and agencies of the United States for purposes of commercial advantage and private financial gain, in violation of 18 U.S.C. §§ 1030(a)(2), (c)(2)(B)(i), and 2.

2.      The Defendant acknowledges that he has read the charge against him contained in the Information and that the charge has been fully explained to him by his attorney.

3.      In consideration of the undertakings contained herein, this Office agrees that it will not pursue any additional charges related to the defendant's involvement in criminal activity in the Southern District of Florida that was the subject of this Office's investigation bearing USAO Numbers 2017R01152, 2022R00712, and 2022R00713.

4.     The Defendant is aware that the sentence will be imposed by the Court after considering the advisory Federal Sentencing Guidelines and Policy Statements (hereinafter "Sentencing Guidelines"). The Defendant acknowledges and understands that the Court will compute an advisory sentence under the Sentencing Guidelines and that the applicable guidelines will be determined by the Court relying in part on the results of a pre-sentence investigation by the Court's probation office, which investigation will commence after the guilty plea has been entered. The Defendant is also aware that, under certain circumstances, the Court may depart from the advisory sentencing guideline range that it has computed, and may raise or lower that advisory sentence under the Sentencing Guidelines. The Defendant is further aware and understands that the Court is required to consider the advisory guideline range determined under the Sentencing Guidelines, but is not bound to impose a sentence within that advisory range; the Court is permitted to tailor the ultimate sentence in light of other statutory concerns, and such sentence may be either more severe or less severe than the Sentencing Guidelines' advisory range. Knowing these facts, the Defendant understands and acknowledges that the Court has the authority to impose any sentence within and up to the statutory maximum authorized by law for the offense identified in paragraph 1 and that the Defendant may not withdraw the plea solely as a result of the sentence imposed.

5.     The Defendant also understands and acknowledges that, as to the charge contained in the Information, the Court may impose a statutory maximum term of imprisonment of up to five (5) years. In addition to any term of imprisonment, the Court may also impose a period of supervised release of up to three (3) years to commence at the conclusion of the period of imprisonment. In addition to a term of imprisonment and supervised release, the Court may

2

impose a fine of up to the greater of $250,000, pursuant to 18 U.S.C. § 3571(b)(3), or twice the pecuniary gain or loss, pursuant to 18 U.S.C. § 3571(d).

6.      The Defendant further understands and acknowledges that, in addition to any sentence imposed under paragraph five (5) of this agreement, a special assessment of $100 will be imposed on the Defendant.  The Defendant agrees that any special assessment imposed shall be paid at the time of sentencing.

7.      The Defendant understands and acknowledges that as a result of this plea, he may be excluded from future participation in government contracts and grants under the Small Business Innovative Research (SBIR) Program, the Small Business Technology Transfer (STTR) Program, and other federal programs.

8.      The Defendant shall provide the Probation Office and counsel for this Office with a full, complete, and accurate personal financial statement.  If the Defendant provides incomplete or untruthful statements in his personal financial statement, such action shall be deemed a material breach of this agreement and this Office shall be free to pursue all appropriate charges against him notwithstanding any agreements to forbear from bringing additional charges as may be otherwise set forth in this agreement.

9.      This Office reserves the right to inform the Court and the Probation Office of all facts pertinent to the sentencing process, including all relevant information concerning the offenses committed, whether charged or not, as well as concerning the Defendant and the Defendant's background. Subject only to the express terms of any agreed-upon sentencing recommendations contained in this plea agreement, this Office further reserves the right to make any recommendation as to the quality and quantity of punishment.

3

10.     Provided that the Defendant commits no new criminal offenses and provided that he continues to demonstrate an affirmative recognition and affirmative acceptance of personal responsibility for his criminal conduct, this Office agrees that it will recommend at sentencing that the Defendant receive a three-level reduction for acceptance of responsibility pursuant to Section 3E1.1 of the Sentencing Guidelines, based upon the Defendant's recognition and affirmative and timely acceptance of personal responsibility. This Office, however, will not be required to make this sentencing recommendation if the Defendant: (1) fails or refuses to make a full, accurate, and complete disclosure to this Office and the Probation Office of the circumstances surrounding the relevant offense conduct and his present financial condition; (2) is found to have misrepresented facts to this Office prior to entering this plea agreement; or (3) commits any misconduct after entering into this plea agreement, including but not limited to committing a state or federal offense, violating any term of release, or making false statements or misrepresentations to any governmental entity or official.

11.     The Defendant admits and acknowledges that the following facts are true and that this Office could prove them at trial beyond a reasonable doubt:

a.      that the Defendant's offense level should be calculated pursuant to U.S.S.G. § 2B1.1;

b.      that the loss was more than $1,500,000 and less than $3,500,000;

c.      that the Defendant knowingly and willfully aided and abetted S.F., R.N., and other non-U.S. persons to intentionally access computers without authorization and thereby obtain information from a number of government departments and agencies, that is, the Department of the Army, the Missile Defense Agency, the Defense Advanced Research Projects Agency, and the National Aeronautics and Space Administration;

4

d.      that the Defendant's participation in this conduct was for purposes of commercial advantage and private financial gain; and

e.      that the offense involved computer systems used by or for governmental entities in furtherance of the national defense and national security.

12.      Although not binding on the Probation Office or the Court, this Office and the Defendant further agree that they will jointly recommend that the Court neither depart upward nor depart downward under the Sentencing Guidelines when determining the advisory sentencing guideline range in this case.  Both parties are free to seek a variance from the applicable Guideline sentence pursuant to the factors in Title 18, United States Code, Section 3553(a).

13.      The Defendant agrees, in an individual and any other capacity, to forfeit to the United States, voluntarily and immediately, any right, title, and interest to any property constituting, or derived from, proceeds obtained, directly or indirectly, as the result of the offense charged in the Information, pursuant to 18 U.S.C. § 982(a)(2)(B) and 18 U.S.C. § 1030(i); and any personal property used, or intended to be used, to commit such offense, pursuant to 18 U.S.C. § 1030(i). The Defendant agrees to forfeiture of substitute property pursuant to 21 U.S.C. § 853(p). The property subject to forfeiture includes, but is not limited to:

a.  a forfeiture money judgment in the amount equal to the value of the gross proceeds traceable to the offense, that is, approximately $1,749,776.80.

14.      The Defendant further agrees that forfeiture is independent of any assessment, fine, cost, restitution, or penalty that may be imposed by the Court. The defendant knowingly and voluntarily agrees to waive all constitutional, legal, and equitable defenses to the forfeiture, including excessive fines under the Eighth Amendment to this Office Constitution. In addition, the

5

defendant agrees to waive: any applicable time limits for administrative or judicial forfeiture proceedings, the requirements of Fed. R. Crim. P. 32.2 and 43(a), and any appeal of the forfeiture.

15.     The Defendant also agrees to fully and truthfully disclose the existence, nature and location of all assets in which the Defendant has or had any direct or indirect financial interest or control, and any assets involved in the offense of conviction. The Defendant agrees to take all steps requested by this Office for the recovery and forfeiture of all assets identified by this Office as subject to forfeiture. This includes, but is not limited to, the timely delivery upon request of all necessary and appropriate documentation to deliver good and marketable title, consenting to all orders of forfeiture, and not contesting or impeding in any way with any criminal, civil or administrative forfeiture proceeding concerning the forfeiture.

16.     In furtherance of the satisfaction of restitution and a forfeiture money judgment entered by the Court in this case, the Defendant agrees to the following:

a.     submit a financial statement to this Office upon request, within 14 calendar days from the request;

b.     maintain any asset valued in excess of $10,000, and not sell, hide, waste, encumber, destroy, or otherwise devalue such asset without prior approval of this Office;

c.     provide information about any transfer of an asset valued in excess of $10,000 since the commencement of the offense conduct in this case to date;

d.     cooperate fully in the investigation and the identification of assets, including liquidating assets, meeting with representatives of the United States, and providing any documentation requested; and

e.      notify, within 30 days, the Clerk of the Court for the Southern District of

Florida and this Office of: (i) any change of name, residence, or mailing address, and (ii)

any material change in economic circumstances.

17.     The Defendant further understands that providing false or incomplete information

about assets, concealing assets, making materially false statements or representations, or making

or using false writings or documents pertaining to assets, taking any action that would impede the

forfeiture of assets, or failing to cooperate fully in the investigation and identification of assets

may be used as a basis for: (i) separate prosecution, including, under 18 U.S.C. § 1001; or (ii)

recommendation of a denial of a reduction for acceptance of responsibility pursuant to the United

States Sentencing Guidelines § 3E1.1.

18.     The Defendant acknowledges that because the offense of conviction occurred after

April 24, 1996, restitution is mandatory without regard to the Defendant's ability to pay and that

the Court must order the Defendant to pay restitution for the full loss caused by his criminal

conduct pursuant to Title 18, United States Code, Section 3663A. Furthermore, the Defendant

stipulates that he owes restitution in the amount of approximately $1,749,776.80 jointly and

severally with Accelogic LLC and Intellectual Property Systems, LLC.

19.     The Defendant recognizes that pleading guilty may have consequences with respect

to the Defendant's immigration status if the Defendant is not a citizen of the United States.  Under

federal law, a broad range of crimes are removable offenses.  Removal and other immigration

consequences are the subject of a separate proceeding, however, and defendant understands that

no one, including the defendant's attorney or the Court, can predict to a certainty the effect of the

defendant's conviction on the defendant's immigration status.  Defendant nevertheless affirms that

the defendant wants to plead guilty regardless of any immigration consequences that the

7

defendant's plea may entail, even if the consequence is the defendant's automatic removal from the United States.

20.     The Defendant is aware that the sentence has not yet been determined by the Court. The Defendant is also aware that any estimate of the probable sentencing range or sentence that the Defendant may receive, whether that estimate comes from the Defendant's attorney, this Office, or the Probation Office, is a prediction, not a promise, and is not binding on this Office, the Probation Office, or the Court. The Defendant understands further that any recommendation that this Office makes to the Court as to sentencing, whether pursuant to this agreement or otherwise, is not binding on the Court and the Court may disregard the recommendation in its entirety. The Defendant understands and acknowledges, as previously acknowledged in paragraph four (4) above, that the Defendant may not withdraw his plea based upon the Court's decision not to accept a sentencing recommendation made by the Defendant, this Office, or a recommendation made jointly by both the Defendant and this Office.

21.     The Defendant is aware that Title 18, United States Code, Section 3742 affords him the right to appeal the sentence imposed in this case. Acknowledging this, in exchange for the undertakings made by this Office in this plea agreement, the Defendant hereby waives all rights conferred by Section 3742 to appeal any sentence imposed, including any forfeiture or restitution ordered, or to appeal the manner in which the sentence was imposed, unless the sentence exceeds the maximum permitted by statute or is the result of an upward departure and/or an upward variance from the Sentencing Guidelines range that the Court establishes at sentencing. The Defendant further understands that nothing in this agreement shall affect the right of this Office and/or its duty to appeal as set forth in Title 18, United States Code, Section 3742(b); however, if this Office appeals the Defendant's sentence pursuant to Section 3742(b), the Defendant shall be

8

released from the above waiver of appellate rights. By signing this agreement, the Defendant acknowledges that he has discussed the appeal waiver set forth in this agreement with his attorney. The Defendant further agrees, together with this Office, to request that the District Court enter a specific finding that the Defendant's waiver of his right to appeal the sentence to be imposed in this case was knowing and voluntary.

22.    The Defendant agrees that if he fails to comply with any of the provisions of this Agreement, makes false or misleading statements before the Court or to any agents of this Office, commits any further crimes, or attempts to withdraw the plea, this Office will have the right to characterize such conduct as a breach of this agreement.  In the event of such a breach: (a) this Office will be free from its obligations under the agreement and further may take whatever position it believes appropriate as to the sentence and the conditions of the Defendant's release (for example, should the Defendant commit any conduct after the date of this agreement that would form the basis for an increase in the Defendant's offense level or justify an upward departure); (b) the Defendant will not have the right to withdraw the guilty plea; (c) the Defendant shall be fully subject to criminal prosecution for any other crimes that he has committed or might commit, if any, including perjury and obstruction of justice; and (d) the Defendant waives any protections afforded by Section 1B1.8(a) of the Sentencing Guidelines, Rule 11 of the Federal Rules of Criminal Procedure, and Rule 410 of the Federal Rules of Evidence, and this Office will be free to use against the Defendant, directly and indirectly, in any criminal or civil proceeding, any information, statements, and materials provided by the Defendant, including any factual proffers, in-court testimony, or interviews.  The defendant further waives any claim that such prosecution is time-barred where the statute of limitations – as extended by the parties' Sixth Extension of

Statute of Limitations Tolling Agreement – has expired between the signing of this agreement and the commencement of any such prosecution.

23.    This is the entire agreement and understanding between this Office and the Defendant. There are no other agreements, promises, representations, or understandings.

JUAN ANTONIO GONZALEZ
UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF FLORIDA

Date: 6/8/2022

A. MARIE VILLAFAÑA
ASSISTANT UNITED STATES ATTORNEY

Date: 6/7/2022

JUAN GUILLERMO GONZALEZ
DEFENDANT

Date: 6/7/2022

PETER ZEIDENBERG, ESQ.
COUNSEL FOR DEFENDANT

10

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 22-60101-CR-CANNON/REINHART**

**UNITED STATES OF AMERICA**

vs.

**JUAN GUILLERMO GONZALEZ,**

     **Defendant.**

_____/

**FACTUAL PROFFER**

     The United States Attorney's Office and Juan Guillermo Gonzalez (hereinafter referred to as the "Defendant") stipulate and agree that, if this case had proceeded to trial, the United States would have proven the following facts beyond a reasonable doubt, and these facts provide a sufficient basis for the Defendant's guilty plea:

     1.     The Defendant was a founder, a Managing Member, and the President of Accelogic LLC ("Accelogic"). Accelogic was a limited liability company originally formed in the State of Delaware on April 8, 2005, that remained registered with the State of Delaware until canceled by the Defendant on April 1, 2017. Although registered in Delaware, Accelogic was located in Broward County, Florida, in the Southern District of Florida from at least as early as May 2005 through the date of the Information. On November 26, 2008, the Defendant, on behalf of Accelogic, filed an application with the Florida Division of Corporations for authorization to transact business in Florida. On March 27, 2017, the Defendant filed Articles of Conversion to convert Accelogic from a Delaware LLC to a Florida LLC.

     2.     The Defendant also was a founder and a Managing Member of Intellectual Property Systems, LLC, a/k/a "Intellep" ("Intellep"). Intellep was a limited liability company originally formed in the State of Delaware on April 12, 2001, that remained registered with the State of Delaware until canceled by the Defendant on April 1, 2017. Although registered in Delaware, Intellep was located in Broward County, Florida, in the Southern District of Florida from at least as early as May 2005 through the date of the Information. On January 15, 2009, the Defendant, on behalf of Intellep, filed an application with the Florida Division of Corporations for authorization to transact business in Florida. On March 22, 2017, the Defendant filed Articles of Conversion to convert Intellep from a Delaware LLC to a Florida LLC.

     3.     From 2008 through 2020, most of Accelogic's income came from Small Business Innovation Research Program (SBIR) and Small Business Technology Transfer (STTR) contracts and grants that were funded by federal agencies, including the U.S. Air Force, the U.S. Army, the Defense Advanced Research Projects Agency (DARPA), the Missile Defense Agency (MDA), the

Department of Energy (DOE), and the National Aeronautics and Space Administration (NASA). The SBIR and STTR programs were highly competitive programs set up to encourage small U.S.-based businesses to engage in federal research and development with the potential for commercialization and to stimulate the U.S. economy.  For those reasons, and due to the sensitive nature of some of the research undertaken as part of the programs, the contracts specified that all research and development work sponsored by the contracts needed to take place inside the United States.  Some of the contracts also specified that certain types of work could only be performed by "U.S. persons," which was defined as United States citizens and legal permanent residents only.

4.     For all of the contracts and grants that were awarded to Accelogic, the Defendant oversaw the preparation of the proposals; he approved the submission of the proposals; he was listed as the Principal Investigator; and he either handled all negotiations himself or authorized and delegated the negotiations to trusted persons.  As Principal Investigator, the Defendant also conducted research and development and oversaw others' work on the SBIR and STTR contracts. The Defendant was also responsible for deciding which Accelogic employees and consultants would work on the contracts.

5.     Section 1030 of Title 18 defines the term "computer" to include "an electronic, magnetic, optical, . . . or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility directly related to or operating in conjunction with such device . . ." 18 U.S.C. § 1030(e)(1).  This includes file sharing and storage on remote data servers whereby software or other information is posted on a data storage facility that can be accessed remotely by a processing unit that downloads and makes use of the downloaded software/information.

6.     Section 1030 of Title 18 further defines the term "protected computers" to include: (1) computers (as defined above) used exclusively for the United States Government; or, (2) computers (as defined above) used by or for the United States Government and the conduct constituting the offense affects that use.  18 U.S.C. § 1030(e)(2).

## ARMY CONTRACT W911W6-16-C-0007

7.     On or about October 28, 2015, the Defendant, on behalf of Accelogic, submitted a proposal for an SBIR contract with the Army, valued at $159,993.00, entitled "Industrial-Quality Porting of the Army's Helios CFD Code into Xeon-Phi Enabled Systems – A Process-Based Approach for Maximal Speedup." As part of that proposal, Accelogic agreed that it would develop a proof-of-concept prototype that would demonstrate the ability of Accelogic's software acceleration technology to provide very large speedups for DoD's Helios software.

8.     As part of its proposal, Accelogic was required to confirm that all work would take place inside the United States and also to disclose whether any Foreign Citizens would work on the project.  The Defendant, on behalf of Accelogic, confirmed that all R&D work would take place at Accelogic's business premises.  And the Defendant, on behalf of Accelogic, disclosed only one non-U.S. person:  "One of the employees expected to assist in the development of the proposed technology (including algorithms and software prototypes), namely [R.N.], is a Colombian citizen working on H1B status."

9.     During the review of the proposal, two of the evaluators expressed concern that [R.N.] had been proposed as a key staff member, noting that, "One member of proposed key staff is H1B foreign national, may restrict access to ITAR codes"; and "One of the proposed collaborators is a foreign national on H1B status.  Because Helios is subject to export control restrictions this individual may get limited access to Helios."

10.     Accelogic's proposal was selected, and the Defendant engaged in negotiations for the contract.  During those negotiations, the Defendant confirmed that all work would be performed in the United States.  The contract, numbered W911W6-16-C-0007, was signed on October 27, 2015, and had an effective date of October 27, 2015.  The contract incorporated by reference the ITAR and EAR restrictions on using foreign nationals and not allowing work outside the United States.

11.     As part of its work on the Army contract, the Defendant and other Accelogic employees were given access to the Army's Cart-p software, a subset of SAMCart, subject to a software license agreement between the Department of Defense (represented by the High Performance Computing Modernization Program (HPCMP)) and Accelogic.  The Defendant signed the HPCMP License Agreement, which specified that Accelogic could not redistribute the software or allow a contractor or subcontractor to use the software unless pre-approved in writing by HPCMP, and such pre-approval was limited to use by U.S. contractors or sub-contractors.  The Agreement further warned Accelogic that the software was subject to the Arms Export Control Act or the Export Administration Act of 1979 and violations of those acts could result in criminal penalties.  The Agreement informed Accelogic that it had to obtain written approval from the Contracting Agency prior to assigning work or granting access to the software to any non-U.S. person.

## MDA CONTRACT HQ014718C7211

12.     On or about June 21, 2017, the Defendant, on behalf of Accelogic, submitted a proposal for a Phase I SBIR contract with the MDA, valued at $154,987.86, entitled "Industrial-Quality Acceleration of MDA's Missile Defense Simulation Infrastructures – A Novel Theory of Optimal Data Compression Inspired on the OSF."  As part of that proposal, Accelogic agreed that it would "establish for the first time the revolutionary theory of 'speedup centric' optimal compression . . . along with a powerful battery of novel OSF-inspired compression methods and implementation innovations necessary for substantially accelerating the performance of MDA's Objective Simulation Framework (OSF) through data compression."  Accelogic promised to prepare a fully functional prototype addressing both real-time and file-transfer operation modes in OSF simulations, relying on synthetic and publicly available data, as well as OSF sample datasets promised by defense contractor Teledyne that involved confidential government information.

13.     As part of its proposal, Accelogic was required to confirm that, during the performance of the award, the research/research and development would be performed in the United States, and the proposal promised that, during the performance of the award, the research/research and development, would be performed at Accelogic's offices in Weston, Florida.

14.     Accelogic's proposal was selected, and, with the Defendant's approval, Accelogic engaged in negotiations for the contract.  During those negotiations, the Defendant signed a written

certification—that warned him of criminal penalties for false statements—that all research/research and development work would be performed in the United States. The Defendant disclosed that three non-U.S. citizens would work on the contract – himself, R.N., and S.F. The Defendant stated that no other non-U.S. persons would work on the contract. MDA approved the Defendant's and R.N.'s work on the MDA project. On October 11, 2017, MDA informed the Defendant that because the contract could produce export control information, S.F. was not authorized to perform work on the contract. On the same day, the Defendant responded to MDA stating that he would remove S.F. from the project and stating that A.H. would perform the work instead. In truth and in fact, A.H. did not perform any R&D work on the project, and S.F. continued to work as one of the main participants on the project.

15.     The Defendant, on behalf of Accelogic, also completed a Certification Pertaining to Foreign Interests on behalf of Accelogic and stated that Accelogic did not own 10 percent or more of any foreign interest; and that Accelogic "does not have any contracts, agreements, understandings, arrangements, indebtedness, liabilities or obligations with any other foreign person." The Defendant further wrote that three individuals, including J.P., "provide occasional hourly-based consulting to Accelogic on advanced technical aspects" but stated that none of those individuals – including J.P. – would work on the project with MDA. The Defendant did not disclose that J.P. owned and worked for Merida Tech, a business located in Venezuela, and that Merida Tech would, in fact, work on activities that would support the MDA project.

16.     The contract also contained a provision stating that distribution of any technical documents (which was defined to include recorded information and software that conveyed scientific and technical information and technical data) prepared under the SBIR contract, in any state of development or completion, was prohibited outside of the contractor and applicable subcontractors under the contract unless authorized by the Contracting Officer in writing. The contract also notified the Defendant that all technical documents prepared under the Contract needed to be marked with the following:

> WARNING: This document contains technical data whose export is restricted by the Arms Export Control Act (Title 22, U.S.C., Sec 2751, et seq.) or the Export Administration Act of 1979 (Title 50, U.S.C., App. 2401 et seq), as amended. Violations of these export laws are subject to severe criminal penalties. Disseminate in accordance with provisions of DoD Directive 5230.25.

17.     Despite the Defendant's representations and the specific notifications from MDA regarding the sensitive nature of the project and the prohibitions on involvement of non-U.S. persons and the requirement that all work occur inside the United States, the Defendant involved Merida Tech and J.P. in the MDA project.

18.     In early December 2017, the Defendant traveled to Venezuela via Colombia to meet with J.P. and other Merida Tech employees. The Defendant brought computer equipment and information about the MDA project with him and shared that information with J.P. and other Merida Tech employees without authorization from MDA. The Defendant returned to the United States on December 12, 2017, en route to a meeting about the project at MDA on December 13, 2017. When encountered by Customs & Border Protection Officers at the Houston airport upon

re-entering the United States, the Defendant admitted to contracting jobs with Merida Tech, but he never disclosed that information to MDA or any other SBIR or STTR agency.

19.     In addition to the information shared by the Defendant during his December 2017 meeting, the Defendant shared the project's confidential datasets with Merida Tech for Merida Tech to perform testing. The Defendant also provided drafts and final versions of the Final Report for the MDA, bearing the Arms Export Control Act Warning, which employees of Merida Tech reviewed and revised. This information was shared via cloud file-storage platforms and emails.

## DARPA CONTRACT IND17PC00012

20.     On or about April 29, 2016, the Defendant, on behalf of Accelogic, submitted a proposal for a Phase II SBIR contract with DARPA, valued at $1,510,000, entitled "Enabling Extreme Acceleration of Graph Analytics in Real-World Applications." As part of that proposal, Accelogic agreed that it would complete seventeen tasks, resulting in Accelogic implementing "a revolutionary technology that will change the paradigm of how network analysis in cybersecurity is done today." Accelogic proposed to create an accelerated STINGER prototype, followed by an accelerated Neo4j prototype, and lastly a proprietary software prototype named "SOCnow" (for "Security Operations Center now").

21.     As part of its proposal, Accelogic was required to confirm that the research/research and development work on the award would take place inside the United States and also to disclose whether any Foreign Citizens would work on the project. The Defendant, on behalf of Accelogic, disclosed only one foreign citizen—S.F.—and did not disclose any plan to conduct any work outside the United States.

22.     Accelogic's proposal was selected for award. In the award notification letter, which was addressed to the Defendant, DARPA reminded the Defendant that "the International Traffic in Arms Regulations (ITAR), 22 CFR Parts 120 through 130, and the Export Administration Regulations (EAR), 15 CFR Parts 730 through 799, will apply to all projects with military or dual-use applications that develop beyond fundamental research . . . If use of foreign citizens has been proposed, you must be able to specify their country of origin, the type of visa or work permit under which they are performing and an explanation of their anticipated level of involvement on this project."

23.     The Defendant engaged in negotiations for the contract. The contract, numbered IND17PC00012, was signed on October 24, 2016, and had an effective date of October 24, 2016. The contract specified that prior approval from the Contracting Officer was required before using any foreign national as an employee or a subcontractor to do any work on the contract. The contract also had a "Buy American" clause that required Accelogic to use American-made equipment and products. The contract required prior approval from DARPA for the dissemination or publication of information developed under the contract outside of Accelogic. The contract further specified Accelogic's obligations with regard to the U.S. export control laws and regulations, including ITAR and EAR. During those negotiations, the Defendant confirmed that all work on the contract would be performed inside the United States at Accelogic's business premises and in accordance with the Statement of Work contained in Accelogic's proposal.

5

24.     While conducting the work on the DARPA SBIR contract, Accelogic asked DARPA to provide Accelogic with datasets to use in developing Accelogic's prototypes.  DARPA provided network data to Accelogic via its Program Manager that contained real-life graph data structures from DARPA's network applications.

## NASA CONTRACT # NNX16CA11C (PHASE II)

25.     On or about December 17, 2015, the Defendant, on behalf of Accelogic, submitted a Phase II proposal for an SBIR contract with NASA, valued at $755,000, entitled "Accelerating Memory-Access-Limited HPC Applications via Novel Fast Data Compression."  As part of that proposal, Accelogic agreed to "develop and exploit the new field of Compressive Computing," spearheaded by the company, as applied to memory-access acceleration, and then "move boldly into tackling the acceleration of a real-life high-profile code, namely NASA's Cart3D, improving its performance by a paradigm-shifting 2x to 4x end-to-end wall-clock time acceleration by the end of Phase II."  Accelogic also agreed to "accommodate Cart3D to become 'future-machines-ready,' such that the resulting code [could] easily be ported to the imminent HPC computer architectures of the following decade."  Lastly, Accelogic also proposed to "inject[] a second NASA code with basic Compressive Computing techniques, and provid[e] it with base levels of acceleration of ~1.3-2x."  Pursuant to the Phase I portion of the contract, Accelogic requested access to NASA's CART3D, FUN3D, and TetrUSS/USM3D software code.  NASA granted permission subject to the required software usage agreements.

26.     Accelogic's Phase II work plan contained three objectives: (1) full optimization of Accelogic's compressive computing in NASA's Cart3D software; (2) developing data reordering solutions to improve compression; and (3) developing data structure revamping solutions to improve vectorization and implement lossy compression schemes and arithmetic pruning to make Cart3D (or other NASA software programs) more amenable to compression.  Accelogic also proposed to accelerate a second top HPC NASA code, including packaging and extensions.

27.     As part of its proposal, Accelogic was required to confirm that all work would take place inside the United States; to disclose all subcontractors and consultants who would work on the contract; and to confirm that the contract would be performed in accordance with ITAR export control regulations.  The Defendant, on behalf of Accelogic, confirmed that all R&D work would take place at Accelogic's business premises and in accordance with ITAR export control regulations.  And the Defendant, on behalf of Accelogic, disclosed several consultants, but made no mention of Merida Tech, its owner, J.P., or any of its employees.

28.     Accelogic's proposal was selected, and the Defendant engaged in negotiations for the contract.  During those negotiations, the Defendant confirmed that all work would be performed inside the United States at Accelogic's business premises and in accordance with the Statement of Work contained in Accelogic's proposal.  The contract, numbered NNX16CA11C, was signed on April 27, 2016, and had an effective date of April 27, 2016.  The contract had a number of specifications requiring Accelogic to notify NASA prior to engaging any subcontractors or making any changes to the list of personnel who would work on the contract or the facilities where the work would be performed.  The contract also contained additional notices regarding ITAR and Export Administration Regulations.  The Defendant, on behalf of Accelogic, also agreed that he had read and agreed to NASA's IT Security Management Plan.

29.     In connection with Accelogic's work with NASA, the Defendant, on behalf of Accelogic, signed a series of confidentiality agreements, including the following:

        a.      On October 24, 2013, the Defendant, on behalf of Accelogic, signed a Software Usage Agreement, regarding the FUN3D 12.0, KNIFE, and REFINE software programs. Pursuant to that agreement, the Defendant acknowledged that the software would only be released to employees of Accelogic and that there could be no further distribution of the software, its source code, the executable code, the associated run-time applications, or any subset thereof, without NASA's express prior written approval. The agreement further stated, in bold text, that the software was intended for domestic use only and "shall not" be made available to anyone outside of the United States. In addition, the agreement stated that within the United States, the software "shall not" be made available to foreign persons. The agreement advised the Defendant and Accelogic that failure to obtain necessary export licenses could result in criminal liability.

        b.      Also on October 24, 2013, the Defendant, on behalf of Accelogic, signed a Software Usage Agreement, regarding the TetrUSS software program. Pursuant to that agreement, the Defendant acknowledged that the software would only be released to employees of Accelogic and that there could be no further distribution of the software, its source code, the executable code, the associated run-time applications, or any subset thereof, without NASA's express prior written approval. The agreement further stated, in bold text, that the software was intended for domestic use only and "shall not" be made available to anyone outside of the United States. In addition, the agreement stated that within the United States, the software "shall not" be made available to foreign persons. The agreement advised the Defendant and Accelogic that failure to obtain necessary export licenses could result in criminal liability.

        c.      On May 15, 2014, the Defendant, on behalf of Accelogic, signed a Nondisclosure and Software Usage Agreement regarding the CART3D software, and related technical data and software. Pursuant to that agreement, the Defendant acknowledged that the software and technical data could only be disclosed to Accelogic employees. In addition, the agreement stated that the NASA software and technical data were intended for domestic use only and "shall not" be made available to anyone outside the United States and, within the United States, "shall not" be made available to foreign persons. Further, the restrictions on use, disclosure, and distribution applied to any computer software or data that Accelogic developed that incorporated any portion of the NASA software or technical data. The Defendant, on behalf of Accelogic, certified that neither Accelogic nor any authorized user to whom it would distribute the NASA software or technical data would be a foreign person.

## KNOWING UNAUTHORIZED ACCESS AND FINANCIAL BENEFIT

30.     In connection with the performance of each of the contracts, the Defendant was made aware, through written agreements and warnings, that non-U.S. persons could not access government agency information on government computers, including government remote data storage facilities. The non-U.S. persons with whom the Defendant was working, that is, R.N., S.F., and the owner and employees of Merida Tech, also were aware that they were not authorized

to access the government agency information and the government computers, including government data storage facilities. Despite this knowledge, the Defendant aided and abetted R.N., S.F., and the Merida Tech owner and employees to intentionally access government secure file-sharing systems and software without authorization, including Cart-p, MDA's technical data and datasets, DARPA's datasets and graph data structures, NASA's software, including CART3D, FUN3D, and TetrUSS/USM3D; and to perform research and development, including testing and implementation of the Graphic User Interfaces (GUI interfaces) for the barebones and fully-featured prototypes; creation of performance and validation reports that required running the government software; work on implementing the software for optimizing the NPB-CG benchmark testing; and running experiments to characterize the performance of the software. The experiments and tests done by Merida Tech personnel were conducted in Venezuela, not on Accelogic's premises, by persons who were not disclosed to or approved by any of the government agencies.

31.     The Defendant aided and abetted R.N., S.F., and the Merida Tech owner and employees for purposes of commercial advantage and private financial gain, that is, by using R.N., S.F., and the Merida Tech owner and employees, Accelogic was able to complete the research and development at a lower cost than if they had not been used. The Defendant, as a founder and Managing Member of Accelogic and Intellep, benefitted from the resulting commercial advantage and financial gain.

The United States and the Defendant agree that these facts, which do not include all of the facts known to the United States and to the Defendant, are sufficient to prove the guilt of the Defendant as to the crime of aiding and abetting persons, that is, R.N., S.F., and the Merida Tech owner and employees, to intentionally access a computer without authorization and thereby obtain information from a department or agency of the United States for purposes of commercial advantage and private financial gain; in violation of Title 18, United States Code, Sections 1030(a)(2), (c)(2)(B)(i), and 2.

JUAN ANTONIO GONZALEZ
UNITED STATES ATTORNEY

Date: 6/8/2022          By: _____
                             A. MARIE VILLAFAÑA
                             ASSISTANT UNITED STATES ATTORNEY


Date: 6/7/2022          By: _____
                             PETER ZEIDENBERG, ESQ.
                             ATTORNEY FOR DEFENDANT


Date: 6/7/2022          By: _____
                             JUAN GUILLERMO GONZALEZ, PH.D.
                             DEFENDANT

8

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No.   22-60101-CR-AMC/BER

UNITED STATES OF AMERICA

vs.

**JUAN GUILLERMO GONZALEZ,**

**Defendant.**

_____/

## FORFEITURE STIPULATION AND AGREEMENT ON INTELLECTUAL PROPERTY

The United States of America (the "United States"), by and through the undersigned

Assistant United States Attorneys, and Juan Guillermo Gonzalez, (the Defendant) with

undersigned counsel, (collectively, the "Parties") hereby stipulate and agree as follows:

1.     The Parties agree to resolve certain forfeiture concerns consistent with the sound

policy favoring settlement of legal disputes without resort to unnecessary litigation.

2.     The Court has jurisdiction over the Parties and the subject matter of this Forfeiture

Stipulation and Agreement (the "Agreement").

3.     The Agreement is incorporated into the Plea Agreement, and therefore subject to

the approval by the Court, and a violation of any term or condition shall be construed as a violation

of the Plea Agreement.

4.     In the Plea Agreement, the Defendant agreed to the entry of a forfeiture money

judgment in the amount of $1,749,776.80 in U.S. currency.

5.     The Government has identified as substitute assets the following intellectual

property (the Property):

    a.   U.S. Patent No. 10,305,980;
    b.   U.S. Patent No. 10,114,554;
    c.   U.S. Patent No. 10,965,744;
    d.   U.S. Patent No. 7,849,126.

6.    The Defendant wishes to pursue the opportunity to retain the Property. The Parties hereby agree that within 45 days of entry of the Defendant's guilty plea, the Defendant may retain a private appraiser for appraisal of the current fair market value of the Property, subject to approval by the United States in advance. If the Parties cannot agree on the appraiser, the Court shall decide. This appraisal shall be done at the Defendant's own expense. Any appraisal must be completed no later than 60 days following the Defendant's sentencing.

7.    In lieu of forfeiture of the Property by the United States, the Defendant may make a payment in the amount of the current fair market value of the Property towards the outstanding balance of the forfeiture money judgment entered against the Defendant (the Settlement Payment).

8.    The Defendant agrees to sign an affidavit under penalty of perjury attesting that the Settlement Payment is derived from a legitimate source and agrees to attach proof of the source of funds to such affidavit.

9.    If the Settlement Payment is not remitted to the United States within 120 days of receipt of the valuation, the Defendant consents to the final forfeiture of the Property, and the property may be sold by the United States Marshals Service.

10.    The United States Marshals Service may, but is not required to, use the appraisal provided by the Defendant.

11.    In exchange for the Settlement Payment, the Government agrees to release from forfeiture proceedings the Property.

12.    The Settlement Payment shall be applied towards the outstanding balance of the Defendant's forfeiture money judgment.

13.     This Agreement does not release the Defendant from the obligation to pay the outstanding balance of the Defendant's forfeiture money judgment. Income to the Defendant from work concerning the Property, such as from licensing or future sales of the Property for an amount that exceeds the Settlement Payment, is not released.

14.     Nothing in this Agreement shall be construed to prohibit the Defendant from selling or licensing the Property after the Defendant remits the Settlement Payment described in paragraph 7.

15.     The Defendant agrees that if a determination is made to file for bankruptcy under Chapter 7 or Chapter 11 of the Bankruptcy Code, it shall notice the United States Attorney's Office for the Southern District of Florida no less than thirty (30) days before so filing.

16.     The Defendant shall not commit nor allow any act to be done to diminish or otherwise alter the value of the Property. The Defendant hereby agrees that he will not take any action to encumber, transfer, dispose of or cloud the title to the Property until such payment is made to the United States. The Defendant further agrees that he shall continue to be responsible for all registrations, fees, liens, and other maintenance, claims, and encumbrances against the Property until such payment is made.

17.     The parties further agree that the Settlement Payment shall be made via Electronic Funds Transfer to the United States Marshals Service, in United States currency, with instructions to be provided by the United States Attorney's Office.

18.     If property is forfeited and restoration is appropriate in this case, the U.S. Attorney's Office agrees to make a non-binding request to the Chief of Money Laundering and Asset Recovery Section (MLARS), Criminal Division, U.S. Department of Justice, that any property obtained from the Defendant through forfeiture be applied to any restitution ordered by the Court and distributed to the

victims of the offense in accordance with any restitution order entered in this case. The Defendant understands the decision to apply forfeited funds in this way is in the sole discretion of MLARS and that neither the U.S. Attorney's Office nor MLARS made any promises about whether it will grant this request. The Defendant understands that if this request is denied, the Defendant will be liable to pay restitution and forfeiture pursuant to the Plea Agreement. The Defendant understands that forfeiture and restitution are separate obligations and that the Court does not have the authority to offset them against each other.

19.     The undersigned counsel hereby represents he has reviewed and discussed the Agreement with the Defendant and has advised the Defendant that the terms of the Agreement are in his best interests.

20.     Each of the Parties agrees to bear its own costs and attorney's fees.

21.     The Defendant has read and fully understands each provision of the Agreement, and has freely and voluntarily signed the Agreement.

22.     The Agreement may be executed in one or more counterparts, each of which when executed and delivered shall be an original, and all of which when executed shall constitute one and the same instrument.

[Remainder of page intentionally left blank]

23.    The Agreement contains the entire agreement between the Parties.

FOR DEFENDANT:

6/7/2022
_____
Date

_____
Juan Guillermo Gonzalez

6/7/2022
_____
Date

_____
Peter Zeidenberg
Counsel for Juan Guillermo Gonzalez

FOR THE UNITED STATES OF AMERICA:

JUAN ANTONIO GONZALEZ
UNITED STATES ATTORNEY

6/8/2022
_____
Date

_____
A. Marie Villafaña
Gabrielle Raemy Charest-Turken
Assistant United States Attorneys

5