**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

United States of America,

v.

Juan Guillermo Gonzalez,

Defendant.

Case No. 22-CR-60101-Cannon

**DEFENDANT JUAN GONZALEZ'S SENTENCING MEMORANDUM IN SUPPORT OF**
**NON-CUSTODIAL SENTENCE**

Dr. Juan Gonzalez, by and through the undersigned counsel, respectfully submits this Memorandum in Aid of Sentencing and requests a non-custodial sentence based on the downward variance warranted in this case.

## I.   <u>INTRODUCTION</u>

Dr. Gonzalez is a 54 year-old husband, father, and uniquely talented engineer who came to this country from Colombia 29 years ago and, through his hard-work, perseverance and innate talent, single-handedly discovered a method of compressing vast amounts of computer data so that it can be stored on servers at a fraction of the uncompressed cost. This discovery, the culmination of nearly two decades of work that was paid for by government agencies such as NASA, the Army, and DARPA through a series of contracts issued through the Small Business Innovative Research (SBIR) Program, will ultimately save the United States' tax-payers tens of millions of dollars. And because these breakthroughs were all done pursuant to SBIR contracts, the United States now has the intellectual property rights to the algorithms that make this data compression possible – rights that it will hold in perpetuity.[1]

In many ways, the ground-breaking discoveries made by Dr. Gonzalez and his company, Accelogic, are a paradigm example of how the SBIR Program was designed to work: the government provides seed money to a small business to address a highly complex and technical

---

[1] The impact of the technology developed by Accelogic, which coined the name "Compressive Computing", is not limited to data-storage boosting applications such as the one described above. The technology encompasses four different product lines, the first one focusing on data storage (as above), and the other three focusing on reducing the execution times of software (i.e., accelerating software, hence the name Accelogic) by unprecedented factors. Each one of the product lines derives from the fundamental concepts of the theory of Compressive Computing, and addresses different market needs of substantial value for virtually all industries. Compressive Computing was the subject of all of the SBIR contracts executed by Accelogic during the past decade. It is new field of science which will provide opportunities for the community to commercialize and further develop.

problem in the hopes that a technical problem can be solved and, at the same time, a business enterprise can be launched or sustained and scientists nurtured. That is exactly what happened here: Accelogic was formed by Dr. Gonzalez and over its 17 years of existence, it employed 16 engineers and assistants, as well as dozens of other professionals and consultants. Dr. Gonzalez was able to earn a modest living, the government had its data storage problem solved, and the U.S. taxpayer will save millions of dollars.

Unfortunately, in executing these contracts, Dr. Gonzalez cut corners that should not have been cut. He exaggerated the size of Accelogic and the team that would be working on the contracts, and he permitted unauthorized individuals to work on some of the contracts. He did this to increase the odds that Accelogic would win the highly-competitive contracts and, by using highly-qualified foreign engineers that he knew well and trusted—but were less expensive than U.S. engineers—he was able to reduce his costs. These cost savings were not skimmed off to profit Dr. Gonzalez personally. Dr. Gonzalez poured these savings right back into Accelogic so that more research could be done with the same amount of government dollars.

Dr. Gonzalez has now pled guilty, pre-indictment, to an Information charging him with permitting unauthorized individuals to access a computer and thereby obtain information from departments and agencies of the United States for purposes of commercial advantage and private financial gain, in violation of 18 U.S.C. §§ 1030(a)(2), (c)(2)(B)(i), and 2. In addition, the government has proffered a plethora of related conduct, regarding misrepresentations made by Dr. Gonzalez to the government – misrepresentations made to increase the odds that Accelogic would secure the contract. While Dr. Gonzalez did violate the charged statute, unique and noteworthy facts distinguish this case from the vast majority of white-collar offenses brought in federal court and militate strongly in favor of a downward variance.

Unlike most fraud cases, the alleged victims in this case—the contracting agencies— directly and significantly benefited – and significantly so – from the outstanding work of Dr. Gonzalez and his team. Indeed, because of the ground-breaking work by Dr. Gonzalez on these contracts, the net value of the benefit to the government far exceeded the amount that the agencies paid out to Accelogic. As explained in more detail *infra*, the government will, as a direct result of its contracts with Dr. Gonzalez, save approximately $54 million every five years. In contrast, the total value paid out by the government for the contracts at issue was only $2.9 million.

Of course, this net gain to the government does not exonerate or excuse Dr. Gonzalez's conduct. Dr. Gonzalez recognizes that because of his own poor decisions, he has gone from a widely-respected engineer and entrepreneur to a convicted felon. Regardless of the sentence the Court ultimately decides upon, the life that Dr. Gonzalez formerly led is now over. The business that he spent almost two decades to build is finished. He faces crushing debt and millions of dollars in restitution owed that will likely be impossible to ever fully pay back yet will hang over his head the rest of his life. The life he formerly lived is long gone.

In order to determine a just and appropriate sentence, this Court must consider not just the Sentencing Guidelines, which are but a starting point, but all of the sentencing factors set forth in 18 U.S.C. § 3553(a) to determine the sentence that is sufficient, but not greater than necessary, to vindicate the statutory goals of sentencing.

In this case, the Sentencing Guidelines vastly overstate the seriousness of the offense. Although the loss amount agreed to by the parties is between $1,500,000 and $3,500,000, this figure simply represents the total value of the contracts at issue, without any further analysis or consideration of the benefit conferred to the government. .This calculation simply ignores the fact that, as a result of Dr. Gonzalez and his team's work, the government will save tens of millions of

dollars in data storage costs—far and away exceeding the dollar value of the contracts at issue. The Sentencing Guidelines calculation ignores the benefit receive by the government and, calculates a Guideline no differently than if Dr. Gonzalez had no intention or ability to perform any of the work that he contracted to do and, instead, simply pocketed several million dollars of the government's money and shirked the work. That is the opposite of what happened here. Dr. Gonzalez routinely put in 100-hour-weeks and rarely took a vacation or a day off. In the last 17 years, almost no day passed without Dr. Gonzalez performing some type of work on these government contracts.

Dr. Gonzalez is a far cry from a fly-by-night fraudster who lied in order to obtain contracts but had no ability or intention to do any of the work and provided no value to the alleged victim. Yet, a strict application of the Guidelines here would result in Dr. Gonzalez and the out-right fraudster being sentenced identically. Courts have repeatedly recognized in similar SBIR and fraud-loss cases that such an equivalence is manifestly unjust, as there can be no comparison between someone like Dr. Gonzalez, who lied to increase the odds that he would win a contract but who performed the work, and a defendant who defrauded the government by falsely claiming he had the ability and intention to do work when the opposite was true. And while it is true that Dr. Gonzalez permitted unauthorized individuals to access the government's computer databases, this was an ill-advised shortcut done in an effort to lower the costs of executing the contract so that more money could be spent on additional research which improved the work. None of the moneys saved were diverted for personal profits or spent on anything other than in increasing the quality of legitimate research legitimate research. *See* **Ex. L**, Report from CPA James Casart, with Affidavit.

None of the foregoing is meant to excuse or justify the wrongful decision by Dr. Gonzalez to use foreign nationals without disclosing it first to the government. But it is meant to differentiate this case from one where the computer data is permanently lost, or where important U.S. secrets or intellectual property was shared with foreign nationals who could then profit from it. That did not occur here.

Dr. Gonzalez is by no means a wealthy man. He and his wife  have lived a frugal life throughout the years, despite having the ability to earn very substantial income. They both drive cars more than 13 years old with many miles on them. The modest house they live in, which was purchased in 2005 for $545,000, today has a mortgage of over $620,000 (due to refinancings) that the Gonzalezes have no prospect of paying. Their bank accounts are all but empty. As the PSR notes, the Gonzalezes have a negative net worth due Dr. Gonzalez' enormous debts, including $1.7 million in restitution that he is personally responsible for, and $2.9 million total if his companies' restitution is included. Despite being a scientist of extraordinary ability[2] and working tirelessly for the past 17 years, Dr. Gonzalez, in advanced middle-age, has almost no funds in his retirement account, and a negative net worth.

Dr. Gonzalez's financial situation is not the result of profligacy. He has always been a frugal man, uninterested in material things. For the past 17 years, virtually all of the money that came into his business was spent on additional research. No government funds were improperly diverted for the personal benefit of Dr. Gonzalez. No government funds were improperly siphoned

---

[2] Dr. Gonzalez has received numerous highly prestigious awards and recognition, including the granting of his EB-1 Green Card in 2005, by virtue of national interest due to him being a "scientist of extraordinary ability."

off to pay off personal credit card debt or to pay for luxury vacations or homes. [3] And there can be no legitimate dispute that Accelogic worked on cutting-edge, novel science that the government evaluators determined to be hugely successful. Letters from government agencies attest to the incredible accomplishments made by Accelogic pursuant to these SBIR contracts.

A strict application of the Guidelines would also fail to account for Dr. Gonzalez as a unique individual. In an against-all-odds story, Dr. Gonzalez grew up in Colombia without any privileges. As a direct result of extraordinarily hard work, determination and innate talent, Dr. Gonzalez was able to realize his dream of coming to the United States to make a better life for himself. Upon arriving in the United States, Dr. Gonzalez achieved tremendous technological—though not financial—success. Dr. Gonzalez was determined to transform his ideas into technology that could help address the critical needs of the government—a goal that was, in fact, accomplished.

In light of the sentencing factors set forth in 18 U.S.C. § 3553(a), and for the reasons set forth below, Dr. Gonzalez respectfully suggests that a downward variance from the Guidelines' sentencing range is warranted in this case. Specifically, based on the particular facts of Dr. Gonzalez's offense—most particularly, the incredible cost savings to the government that it will enjoy as a direct result of Dr. Gonzalez's hard work, his pre-indictment plea, and the approach

---

[3] Each of the government agencies audited and approved Dr. Gonzalez's hourly rate of $148.50. At that rate, if Dr. Gonzalez had worked an average workload of 40 hours/week (a fraction of what he actually worked), his yearly salary would have been $308,880, which is about double the net income that his family actually earned when both he and his wife were working at the company ($157,187). Given that Dr. Gonzalez consistently worked between 70 and 100 hours per week throughout the years, the actual yearly salary that was pre-approved for Dr. Gonzalez by all of the Government agencies was in the range of $540,540 to $772,200. Yet, the couple only received net payments cash corresponding to an average combined net income of $157,187 per year. The value of Dr. Gonzalez's work alone that was not charged to the contracts demonstrates the personal investment that Dr. Gonzalez made.

taken in similar SBIR cases prosecuted all over the country, a non-custodial sentence of probation or, alternatively, home confinement, would be sufficient, but not greater than necessary, to satisfy the sentencing factors set forth in § 3553(a). *See Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (noting that the objective in sentencing is that it be "sufficient, but not greater than necessary" to meet the ends of justice).

II.     **BACKGROUND**

    A.     **Dr. Gonzalez's early life and education.**

Dr. Gonzalez was born in a close-knit family in Palmira, Colombia. His father owned a small clothing store. When Dr. Gonzalez was about 15 years old, his father became ill and Dr. Gonzalez had to take over running the store, which he did with great success. Eventually, his father decided to try his hand at farming, and became the owner of a small coffee plantation. As a child and young man, Dr. Gonzalez worked extensively at both businesses, and learned much from each. But his passion, and where he truly excelled, were in his studies at school.

Dr. Gonzalez has suffered from hyperactivity and obsessive-compulsive behavior his entire life. While this has caused him tremendous anxiety and, at times, serious depression, it has also helped drive him to tremendous success. He has always been a hard worker, capable of working 24, 36, or even, on occasion, 48 hours straight when closing in on the solution to a vexing problem. His drive emanated from his desire not to waste his talents, and to make a positive impact on the world. For Dr. Gonzalez, "success" means an important scientific discovery that benefitted society, *not* material or financial security.

Dr. Gonzalez excelled at school from the very beginning of his education and was always the top student in his class throughout elementary, middle, and high-school. In 1984, when he was 16 years old, his principal registered him and nine other of the best students in his school to

7

participate in a national math competition. Without any training, Dr. Gonzalez finished second in his state. As a result, he was invited to train with an elite team in Bogota, Colombia for a week – it was at that moment that he realized he had a unique gift, and was soon hooked to the thrill of the math competitions and began training for the most important math competition of the country: the Colombian Mathematics Olympiads. His training paid off, as he came in third place out of 400,000 students in his first year of competition.[4] That finish was enough to place him onto the Colombian national team where he represented Colombia in the International Math Olympiads that took place in Finland in 1985, where the team obtained a score that broke the country record for Colombia. He did even better in his second year, coming in first place in the Colombian Olympiad then going on to win a bronze medal for Colombia in the first international Iberoamerican Olympiad, and again representing Colombia in the International Math Olympiads of 1986, this time in Poland.[5] Dr. Gonzalez was recognized by the Colombian government for having one of the top 50 SAT scores in the country.[6] This award opened many doors and a wide choice of scholarships for universities.

In 1990, Dr. Gonzalez studied electrical engineering at Universidad Pontificia Bolivariana (UPB), where he was ranked first in his class. While still studying electrical engineering, he also enrolled at another university, the National University of Colombia (Unal) to study mathematics. At the same time, Dr. Gonzalez was also studying English, and had two jobs as a Teaching Assistant, one at each university. Remarkably, despite this extraordinary workload, Dr. Gonzalez

---

[4] **Ex. A.**

[5] *Id.*

[6] **Ex. B.**

was recognized as being the top student at both universities.[7] In 1993, Dr. Gonzalez obtained yet another degree – a Masters degree in statistics.

After graduation, Dr. Gonzalez worked for several years at the city of Medellin's telephone company as an engineer while working simultaneously as an instructor professor at his first alma matter (UPB), and pursuing the Masters degree in statistics at his second alma matter (Unal). Still restless intellectually, in 1993 Dr. Gonzalez decided to pursue his Ph.D. in electrical engineering at the University of Delaware, which offered him a generous job offer as a researcher-student——a critical factor as Dr. Gonzalez's family could not afford the cost of graduate school in the United States. At Delaware, Dr. Gonzalez's dissertation was recognized as the best published in the sciences that year.[8] The scientific contributions of Dr. Gonzalez's dissertation[9] have been taught at major universities, and have been used by scientists and organizations worldwide in many different application fields, from astronomy to medical signal processing, to data communications, among others. Many other scientists around the world have continued to pursue research and publications in the area of science opened by Dr. Gonzalez in his dissertation.

After working briefly as a professor and then as a senior scientist at several high-tech companies and two SBIR companies in the field of algorithms, Dr. Gonzalez started Accelogic in

---

[7] **Ex. C.**
[8] **Ex. D.**
[9] Dr. Gonzalez's Ph.D. dissertation focused on his discovery of a new theory of signal characterization and processing, which resulted in the invention of several widely popular algorithms still used by the scientific community today for the filtering/processing of signals and data that are commonly found in real life.  For the contributions of his Ph.D. dissertation, Dr. Gonzalez received the prestigious Allan P. Colburn Best Doctoral Dissertation Award, as the best doctoral dissertation in the exact sciences at the University of Delaware -a noteworthy achievement given the stature of the exact sciences programs of the university, which include Nobel Prize laureates. *See* **Ex. D**.

2005, the same month that his daughter Lia was born. The company began in his "home office", which he and his friends used to call the "office home", because approximately 80 per cent of the home was office space. Accelogic's mission was embedded in its name: to **accelerate** the speed of scientific software that computes solutions to equations, through groundbreaking innovations in numerical algorithms, Dr. Gonzalez's particular area of expertise.[10]

_The "FPGA Computing" Era (2005-2012)._

    Accelogic initially concentrated on research to invent new and faster numerical algorithms in the then nascent field of "FPGA Computing."[11] At the time, FPGAs had the potential to be faster than traditional computer chips (called CPUs) for the computation of arithmetic formulas. Dr. Gonzalez saw an opportunity to be among the first to invent and discover the fastest algorithms for FPGAs.

    After about six years of arduous research work, Accelogic succeeded in 2010 in developing and implementing the fastest FPGA algorithms in the world for an important class of real-life applications. This was an important innovation with substantial commercial value. Although a thrilling discovery, it was, unfortunately, short-lived, as it was soon overtaken by even newer discoveries by other, far more established companies, such as Intel, which that same year developed an even faster "non-FPGA" chip. This development was a crushing blow to Dr. Gonzalez—years of work had gone into developing his algorithms which were now of little or no value.

---

[10] This is an industry called High-Performance Computing, which today is worth over $30 billion, and is growing exponentially.

[11] FPGAs are electronic chips able to compute formulas by programming the wiring of the hardware.

Fortunately, Dr. Gonzalez's years of intense work and focus on creating the FPGA algorithms gave Accelogic a tremendous amount of expertise and gave Dr. Gonzalez a different viewpoint of algorithms, particularly in terms of data compression as a new and powerful means to make computing faster and storage cheaper. Dr. Gonzalez realized that some of the key concepts developed for FPGA computing acceleration via compression could be adapted and ported back into traditional computers, which would make them faster. As a result of ensuing SBIR contracts with NASA and DOE, Accelogic launched Compressive Computing as a ground-breaking technique to accelerate supercomputer software.

This new process enabled unprecedented data compression and boosted the storage capacity of hard disks used at DOE's Nuclear Physics Facilities. The result was that with Accelogic's technology, DOE can store four times more Gigabytes of data using the same hard-drives at no additional cost. The importance of the technology can be understood when one considers that at Nuclear Physics facilities, the amount of data that must be saved every year is on the order of millions of Gigabytes, and this amount grows exponentially every year. This data is stored on costly hard-drives. Being able to store four times more Gigabytes, at no extra hardware cost, will save the government millions of dollars each year. *See* **Ex. E.**

In the ensuing years, and through successive contracts with NASA, DOE, Army, DARPA, and MDA, Accelogic continued to develop this breakthrough technology, which it called "compressive computing", and which vastly increased computing speeds.[12] This work resulted in

---

[12] At the core of this new theory was the discovery of a new, fundamental theorem, which stated that under very general conditions, the vast majority (typically between 70 and 80%) of the bits used in modern large-scale numerical computations are irrelevant for the accuracy of the end result. Accelogic's theory of Compressive Computing provides mechanisms the ability to identify (with high intelligence and near-surgical accuracy) the number of bits (*i.e.*, the precision) that can be used to represent numbers, as they are computed and vary in real time. The result is a state-of-the-

effusive and glowing praise from the government officials and scientists who were impressed with Accelogic's results. For example, in May, 2018, Michael Aftosmis, the Team Lead at the Computational Aerosciences Branch of NASA's Advanced Supercomputing Division at NASA Ames Research Center, wrote to Dr. Gonzalez:

> I'm writing to give you feedback after our testing of the solver module in NASA's Cart3D aerodynamic analysis code using Accelogic's compressive computing boosters. We've tested the modified code on several platforms to date, and have been seeing communication speed-ups similar to what you reported during your development. … Tests on cluster systems with problems of various sizes have shown consistent reductions in communications of over 3x compared to a well-optimized baseline. These speed-ups are particularly noteworthy since they have been achieved without impacting the numerical accuracy, stability or convergence behavior of the solver on real-world problems. Reducing the communication overhead has improved code scalability on these systems and offers significant improvement in turnaround time. **These results are really impressive and we're extremely happy with this outcome.**
>
> **I also wanted to state how impressed we've been with the code profiling that Accelogic performed over the course of this work. The Accelogic team's ability to quickly instrument the code and automatically generate performance profiles for a variety of workloads helped quickly uncover bottlenecks that even our development team was previously unaware of. This has been extremely helpful and has exposed further opportunities for optimization. Many of the lessons from this profiling are finding their way into the production version of Cart3D. This will ultimately lead to a much improved analysis tool across NASA and the Cart3D user base**.

Ex. G (emphasis added).

The Army was similarly impressed. During this same time period, Andrew M. Wissink, an Aerospace Engineer at the Army Research, Development and Engineering Command strongly

---

art compression algorithm that surpasses those currently available for the purpose of enabling substantial economic and operation gains for High Energy and Nuclear Physics data storage/analysis. *See* **Ex. F**.

endorsed Accelogic's SBIR Phase II proposal for improving the performance Objective Simulation

Framework:

> Accelogic was recently awarded an Army [ ] Phase II contract to accelerate Helios high-fidelity rotorcraft simulation software . . . It is commonplace for Helios calculations to require very long computing times as well as large distributed computing resources – on the order of one week or more on over 1,000 computing cores. The ability to perform these calculations more quickly is key to greater adoption of simulation in place of costly flight tests…**The proposal by Accelogic was outstanding, achieving very high scores in technical merit, due to their experience in accelerating other well-used first-principles aerodynamics software using data movement compaction/compression for software acceleration**. ….
>
> **Accelogic demonstrated it was able to extract a 42X speedup . . . This is in stark contrast to other researchers who report their code actually *slows down* on compaction/compression opportunities that led to a significant improvement in speed performance**. Further, they were able to strategically reshape the data movement flow to take better advantage of the computer's vector units . . . all of this while preserving the code's quality, maintainability and transparency…
>
> The difficulties in the acceleration of large-scale software systems are often under-appreciated….For the SBIR topic that I proposed to accelerate the Army's large-scale software Helios, three top proposals were selected out of 34 submitted to accelerate a sample code. **Of these three efforts, one produced minimal speedup, a second produced 3X-5X speedup, while Accelogic's produced a 42X speedup. Accelogic's success was possible thanks to an aggressive array of innovations on lossless data movement compaction/compression that they were able to bring from conception to implementation in the short 6 mo Phase I time period . . . Accelgoic has unique capabilities, infrastructure, and know how in the field that they were able to exploit for this SBIR effort.**

*See* **Ex. H**.

Despite these glowing letters that attest to the tremendous benefit received by the granting

agencies, the PSR treats these same contracts as total losses to the government.[13] Even though

---

[13] These letters were written in connection with the following contracts: SBIR NASA contract No. NNX16CA11C (value: $755,000), as well as three previous NASA contracts that were granted one after the other in 2013, 2014, and 2015, by the same Program Managers from NASA's Advanced Supercomputing Division, and two Army contracts also granted one after the other by the same Program Manager from the US Army Aviation Development Directorate:

those responsible for overseeing these contracts found them to be of tremendous value to both

NASA and the Army, the government – and the PSR -- is now treating the entire contracts as a

total loss, and that NASA and the Army are owed the entire amount of each contract in restitution.

These letters were not outliers. In January, 2019, Dr. Jerome Lauret, the Software and

Computing Leader at the Department of Energy's Brookhaven National Laboratory, said about Dr.

Gonzalez's work on a DOE SBIR Phase-II proposal:

> I am thrilled to see Accelogic technologies come to the rescue of our science goals. The Phase-1 study showed compression factors at best of x1.4of our very compact IO format while Accelogic algorithm showed factors of x3.9 hence (near x3 denser) and this, without losses of the Physics capabilities. **We are extremely encouraged with the initial feasibility study and strongly feel this proposal should be moved to a Phase-II with wider community coverage…[W]e see a superb opportunity to provide the community with one of the most transformative approach to data storage saving . . .**
>
> **Simply put, higher compression levels ultimately means more data availability and hence, acceleration of scientific discoveries for big data communities such as the High Energy and Nuclear Physics experiments (that have faced high data demands).**

**Ex. I** (emphasis added).

This letter was written in connection with DOE SBIR contract DE-SC0018521 (value:

$153,218). Once again, despite this glowing letter from the official with first-hand insight into the

value of Dr. Gonzalez's work, the government and the PSR treat this contract as if it is  a total

loss—no different than if Dr. Gonzalez had simply walked away with the government's money

and failed to produce any work product, much less a work product that "means more data

availability and hence, acceleration of scientific discoveries for big data communities." *Id.*

---

contracts No.W911W6-16-C-0007 (for $99,993 in 2016) and No. W911W6-17-C-0026 (for $999,988 in 2017). Clearly, these agencies would not continue awarding contracts to Accelogic if they did not feel that past performances warranted such confidence.

Dr. Lauret followed up with the letter below in October, 2021, and detailed the truly extraordinary savings that Accelogic's technology would achieve for the government:

> We were thrilled to see Accelogic technologies come [to] the rescue of our science goals. The Phase-1 study showed or implemented compression algorithms [ ] to be at best [ ] x1.4 while the Accelogic algorithm showed factors of x3.9 hence near x3 times denser and this, without losses of the physics capabilities. In the Phase II work, similar results were observed in another experiment and factors up to x1000 were seen in integer cases. This is a fantastic result and outcome as two independent experiments and data formats reaching the same conclusions confirms the efficiency of the algorithm toward compressing our scientific data. We are currently in the process of integrating the algorithm into our common software framework (known as ROOT) so the algorithms become widely available to even more experiments in our field as well as performing speed tests comparisons (against the standard compression algorithm enumerated earlier). **Insofar, advantages are clear:  Accelogic technology wins.**
>
> Simply put, higher compression levels mean more data availability and hence, acceleration of scientific discoveries for big data communities  … An idea of scale is that the budget of a single experiment at BNL [ ] predicts an expenditure of [$5.1M] over the period of 2020 -2025 for storage. BNL hosts 2 large experiments [ ] a potential operational cost could quoted as [$10.2M]. A factor of 3.9 compression, if confirmed (and all evidence points at an even greater compression factor in Phase II testing) would imply a cost saving of [$7.7M]. **This figure of merit is easily multiplied by x5 when we consider the LHC experiments and with two large experiments, 2 smaller one[s] comparable to the 2 large [ ] experiments, a potential cost saving would be [$54M] for the HENP community alone.** …
>
> **In conclusion, we are very excited of the performance and results we get from Accelogic compression algorithm which … provides a bleeding advantage on top of standard compression algorithm available on the market. Integrated and available to our communities, those algorithms would be equivalent to a 'secret weapon' allowing to cope with our future data demands and data deluge.**

Ex. E (emphasis added).[14]

---

[14] This letter was written after Accelogic, in conjunction with several DOE National Laboratories, completed a comprehensive round of testing for Accelogic's first commercial Compressive Computing product, called BLAST, which is scheduled to undergo full commercial

The savings to the government resulting from Dr. Gonzalez's labors dwarfs the total amount of money that the government paid to Accelogic. Viewed in those terms, Dr. Gonzalez's work was an enormous success.

This technological breakthrough by Accelogic did not result from any one particular SBIR contract. Rather, it was the result of many years and tens of thousands of hours of incredibly hard work on nearly two dozen such contracts—each one building on the lessons learned from the earlier work. The culmination, now finally realized, is a technology that the government has in its possession today and will save the American tax-payer tens of millions of dollars.

**B.      Dr. Gonzalez's second clinical depression, and his continued commitment to work[15].**

Dr. Gonzalez has a long history of depression and is currently under treatment for clinical depression combined with traits of high obsessive-compulsive behavior. *See* **Ex. J**. His depression started in 2018, perhaps due to burnout from excessive work for the government, including relentless 16-plus hour days, seven days a week with no vacations. In mid-2018, after he learned about the criminal investigation of him and his company, Dr. Gonzalez's depression became more severe, even though he was able—with great difficulty—to keep his commitments to some of the government projects he was working on.

---

release in November this year. BLAST is the culmination of many years of research efforts by Accelogic that has resulted in the maturation of the theory and practice of Compressive Computing, and incorporates many concepts, ideas, and inventions that owe their existence in a direct manner to a total of 12 SBIR contracts executed by Accelogic in the last 10 years.

[15] Due to the sensitive health information described herein Sections B and C, Exhibits J and K have been redacted. Unredacted copies will be provided to all parties.

### C.    Dr. Gonzalez's family life

In 1995, Dr. Gonzalez married his wife, Ana Hernandez. In 2005, their daughter was born. She, too, suffers from crippling clinical depression and anxiety, such that she has been unable to attend school for the past two years. *See* **Ex. K**.

### D.    The offense conduct

Dr. Gonzalez pled guilty to one count of aiding and abetting others to intentionally access a computer without authorization and thereby obtain information from departments and agencies of the United States for purposes of commercial advantage and private financial gain, in violation of 18 U.S.C. §§ 1030(a)(2), (c)(2)(B)(i), and 2. Dr. Gonzalez permitted several foreign nationals – highly trained Venezuelan engineers who Dr. Gonzalez knew well whose abilities he trusted – to access government datasets for testing. Using these foreign engineers permitted Accelogic to save on costs – savings that were then reinvested in research. There was no national security risk; most of  the data at issue was otherwise publicly available but was deemed restricted because, as soon as Accelogic downloaded it to use it for the SBIR project it became "contract related", triggering a clause in the contract that restricted the dissemination of "any contract related data", requiring Accelogic to obtain permission from the Contracting Officer if Accelogic wanted to "disclose it" to a third party. Dr. Gonzalez ignored this mandatory contractual requirement, and proceeded with the release without the official approval by DARPA.[16] Importantly, the foreign

---

[16] The unauthorized individuals were in some cases S.F. and R.N., who were Accelogic employees working at Accelogic's premises under proper H1-b work visa, and who, by virtue of not being U.S. Nationals, were not allowed to access the software as per the NDA. The software was nevertheless maintained under security and confidentiality protocols in computers inside Accelogic's secure network on Accelogic's premises, and was carefully guarded for confidentiality and against inadvertent disclosure. In another example, the unauthorized individuals were persons in Venezuela who were helping primarily with testing efforts, and who, by virtue of being individuals outside Accelogic, were not authorized by the NDA to access the software.

nationals who assisted on the contracts were not able to retain any of the data that they reviewed, and. there is no allegation that national defense or national security were compromised.

The parties have agreed that the loss amount for this and the related conduct was between $1.5 million and $3.5 million. Importantly, this loss figure simply represents the total value of the contracts in which material misrepresentations were found to have occurred. No consideration of the value of the work that Dr. Gonzalez performed on these contracts or the benefits provided to the government is included in the Guidelines calculation. The loss calculation simply assumes that because there was a material misrepresentation made during the execution of the particular contract or  because a non-U.S. person was permitted to access a government-related computer database, then the loss amount to the government is the entire value of the contract.

**E.**      **Related conduct.**

Dr. Gonzalez has also acknowledged responsibility for related conduct in how he performed on other contracts. Essentially, this other conduct involved misrepresentations that were made to enhance the odds that Accelogic would be selected for a particular SBIR contract. For example, Dr. Gonzalez overstated the number of his employees and who would be working on the contract. Although he touted an impressive number of consultants who were available to work on the contract, most of the work was actually done by Dr. Gonzalez and two or three other employees—though all were highly qualified.[17] Nevertheless, the reviewing panels were entitled

---

[17] Given Dr. Gonzalez's unique talents, the fact that he was actually working twice the hours he was budgeted to work not only did not prejudice the government, it should be considered a benefit. Indeed, would be easier to understand complaints that Dr. Gonzalez failed to personally work on the contracts, or did not work sufficient hours, when the government expected him to play the central role.

to an accurate prediction of who would be working on a particular contract, and approximately how the work would be divided up.

The other significant misrepresentation involved the obscuring of the true relationship between Intellep and Accelogic, when, in fact, both companies were effectively controlled by Dr. Gonzalez and his wife. This was not something that was clear to the government and, again, helped increase the attractiveness of the Accelogic proposals, as it made it appear that Intellep's interest in investing in Accelogic was that of a disinterested party.[18]

These misrepresentations were used by Dr. Gonzalez in a foolish attempt to make Accelogic–an outstanding company with experienced and talented employees–appear even more attractive to SBIR grant proposal reviewers in order to increase the likelihood that Accelogic would be awarded SBIR/STTR funds. It is tragic that Dr. Gonzalez felt the need to "gild the lily" by misrepresenting the number of employees at Accelogic and who would be doing the work when Dr. Gonzalez was more than qualified and capable of performing the necessary work and employed highly competent staff to assist him in that work. This was not a company that was unqualified and unable to do the work. Quite the opposite, as the letters from the government attest, the results Accelogic produced were remarkable.

---

[18] It is highly questionable whether this misrepresentation was material to the government. It was clearly no concern to DOE that Intellep was funded by virtue of SBIR contracts awarded to Accelogic, since it awarded Accelogic a contract in 2019 even after Intellep wrote a letter that made explicit that Dr. Gonzalez was "President of both Accelogic and Intellep[,] Intellep is the parent company of Accelogic[,] [and b]oth Intellep itself, as well as its owners and stakeholders have substantial ownership interests in Accelogic." *See* **Ex. M**.

While Dr. Gonzalez acknowledges and accepts that the conduct described in his plea proffer violated the law, it is also true that the work was done, and it was done well. Indeed, once awarded, Accelogic was motivated to produce an outstanding work product so that its chances of winning future awards would be enhanced. For example, NASA awarded Accelogic four consecutive SBIR contracts (in 2013, 2014, 2015, and 2019); DARPA awarded it contracts in 2016 and 2017; the Army in 2016 and 2017; DOE in 2018 and 2019. Each of these contracts built on the technologies developed by the previous ones, and each evolved and matured the new field of science called Compressive Computing. It should go without saying that these agencies would not repeatedly award contracts to Dr. Gonzalez if they were dissatisfied with the work product they received from him.

None of the misrepresentations regarding anticipated labor costs and expenses had any impact on the overall price the government paid for Accelogic's work. All of Accelogic's awarded contracts at issue were firm-fixed price in nature, so that the government knew beforehand exactly how much it would have to pay, secure in the knowledge that any overruns would be the responsibility of Accelogic. None of the payments Accelogic received were contingent on the proposed budget, which merely outlined anticipated costs and expenses. Instead, Accelogic received payment for its delivery of the promised end-product. Regardless of whether Accelogic over- or under-budgeted for items such as equipment in its budget proposals for cost-plus-fixed-fee contracts, Accelogic was only paid for the expenses it could document occurred, and any expenses incurred beyond the set limit were absorbed by Accelogic. Therefore, none of the proposed labor costs and expenses that were not incurred cost the government monetarily. The § 3553(a) factors warrant a downward departure or variance from the guildlines range and support a non-custodial sentence.

**F.     The Guidelines are advisory, and the sentence should be no greater than necessary to satisfy the statutory purposes under § 3553(a).**

At the outset of sentencing, the Court must determine the applicable Sentencing Guidelines range. *See Molina-Martinez v. United States*, 136 S. Ct. 1338, 1342 (2016). Although the Guidelines were once mandatory, following *United States v. Booker*, 543 U.S. 220 (2005), the Guidelines no longer carry the force of law, federal judges are no longer bound to strictly apply them, and "[a] district court may not presume that a Guidelines sentence is reasonable." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc). The Guidelines are now purely advisory, and the Court has significant discretion to vary from the Guideline range. *See id.* at 187–88. Instead of applying the Guidelines as compulsory, the Court has discretion to impose a non-Guideline sentence as long as the sentence is reasonable and justified. *See United States v. Jimenez-Beltre*, 440 F.3d 514, 518 (1st Cir. 2006) (en banc) ("*Booker*'s remedial solution makes it possible for courts to impose non-guideline sentences that override the guidelines, subject only to the ultimate requirement of reasonableness."), *abrogated on other grounds by Rita v. United States*, 551 U.S. 338 (2007); *see also Koon v. United States*, 518 U.S. 81, 96–97 (1996) (determining that a district court is vested with broad discretion to depart from the Guidelines); U.S.S.G §5K2.0 (2018).

The Guidelines are now but a "starting point and initial benchmark" for sentencing. *Gall v. United States*, 552 U.S. 38, 39 (2007). After calculating the Guidelines range, the Court must then "make an individualized assessment based on the facts presented" by the parties. *Id.* Post-*Booker* sentencing involves two steps—after the first step of calculating the Guideline range—the Court must then engage in the second step of considering the § 3553(a) factors to determine a reasonable sentence. *See United States v. Talley*, 431 F.3d 784, 786 (11th Cir. 2005), *abrogated*

*on other grounds by Rita*, 551 U.S. at 338; *United States v. Hung*, 459 F.3d 1180, 1185 (11th Cir. 2006). Just as the Court has discretion to impose a non-Guidelines sentence, "the weight to be afforded any § 3553(a) factor is a matter firmly committed to the discretion of the sentencing judge." *United States v. Verkhoglyad*, 516 F.3d 122, 131 (2d Cir. 2008) (quotation marks omitted). Furthermore, the Court has discretion to decide whether any § 3553(a) factor justifies a downward variance. *See Gall*, 552 U.S. at 51. When imposing a sentence outside the Guidelines range, the Court applies a non-mathematical formula with individualized assessments based on facts presented by the parties. *Id.* at 47, 50.

This Court must be guided by the fact that the ultimate sentence should be "not greater than necessary to accomplish the sentencing goals advanced in § 3553(a)(2)." *Kimbrough v. United States*, 552 U.S. 85, 89, 111 (2007).

## G.  A non-custodial sentence is appropriate in light of Dr. Gonzalez 's personal history and characteristics (§ 3553(a)(1)).

Dr. Gonzalez is responsible for his conduct. His embarrassment and shame are palpable. But as his support letters attest, he is not a bad person. To the contrary, those who have known Dr. Gonzalez best know him to be a good and decent man, a devoted husband, father and mentor to other young scientists and engineers. He poses no threat to society. He is not a danger to reoffend. For these and reasons listed below, a downward variance and probationary sentence is appropriate.

## H.  A downward variance is warranted because a strict application of the Guidelines overstates the seriousness of the offense and results in an unjust sentence.

A downward variance is warranted because the Guidelines' loss enhancement provisions would result in an excessive sentence that overstates the seriousness of the offense, resulting in a grave injustice. Although the loss amount agreed to by the parties is between $1,500,000 and $3,000,000, this amount must be considered in full context and then compared to other SBIR cases.

*First*, a downward variance is warranted because the nature of this fraud was less serious than the vast majority of the frauds contemplated by the Guidelines. Not all frauds are alike or warrant similar punishments. A fraudster that is neither capable or willing to perform a contract is surely far more culpable than one that obtains a contract through fraud but always intends to perform the work and, in fact, returns great value to the contracting agency.

Similarly, the nature of the fraud committed by Dr. Gonzalez is fundamentally different—and significantly less culpable harmful—than the type of fraud contemplated by the fraud-loss Guidelines which envisions a scenario where a fraudster seeking an SBIR award as a Principal Investigator fabricated his credentials in order to win an award and, having obtained an initial payment, simply absconded with the funds. Here, of course, something very different occurred: Dr. Gonzalez provided enormous value to the government – something that is ignored in these fraud-loss calculations.

This distinction in the true nature of different frauds was noted by Judge Posner in *United States v. Schneider*, 930 F.2d 555, 558 (7th Cir. 1991). Judge Posner recognized the crucial distinction between frauds that involve outright thefts of funds and frauds that involve misrepresentations of what exactly the opposing party would receive under a contract:

> [I]t is necessary to distinguish between two types of fraud. One is where the offender—a true con artist [ ]—does not intend to perform his undertaking, the contract or whatever; he means to pocket the entire contract price without rendering any service in return. In such a case the contract price is a reasonable estimate of what we are calling the expected loss, and we repeat that no more than a reasonable estimate is required. The other type of fraud is committed in order to obtain a contract that the defendant might otherwise not obtain, but he means to perform the contract (and is able to do so) and to pocket, as the profit from the fraud, only the difference between the contract price and his costs.

*Id.* (citations omitted). The Eleventh, Ninth, and Fifth Circuits have echoed this distinction, explaining that "fraud is not always the same as theft." *United States v. Martin*, 796 F.3d 1101,

1108 (9th Cir. 2015); *see also United States v. Tatum*, 138 F.3d 1344, 1346 (11th Cir. 1998) ("[T]he analysis in a case of fraud is not as simple as in a case of simple theft. . . In some cases of fraud, there will be a similar intent to deprive the victim of the full amount fraudulently taken. However, in other cases of fraud, the perpetrator may intend no loss."); *United States v. Harris*, 821 F.3d 589, 607 (5th Cir. 2016); *United States v. Javat*, No. 18-CR-20688, (S.D. Fla. Dec. 17, 2019), ECF No. 459 at p. 11. Because Dr. Gonzalez always intended to fully perform the awarded contracts and, in fact, performed them not just to the government's satisfaction but surpassing any reasonable expectations regarding performance, he should not be sentenced as if he intended to defraud the government of the entire value of the contracts. *See United States v. Sublett*, 124 F.3d 693, 695 (5th Cir. 1997) (citing *Schneider* and reasoning that "one who uses fraud to procure a contract but intends to provide the contracted services . . . should not be characterized as causing as much loss as one who intends to totally cheat the victim, giving nothing in return").

There can be no question that Dr. Gonzalez's offense fits into the more benign category described by Judge Posner above: Dr. Gonzalez was a highly trained, extremely well-qualified engineer with the competence, ability, and intent to do the work he proposed to do. Accelogic completed the work with spectacular results. Indeed, as the letters attest, the technology invented by Accelogic will save the United States—meaning the taxpayers—approximately $54 million in the next five years.[19]

The fraud loss guidelines overstate the seriousness of this offense because they treat the loss here no differently than out-right theft—something that clearly did *not* happen here. Dr. Gonzalez worked 100-hour weeks, sometimes longer. He took no vacations and rarely even a day

---

[19] *See* Exs. **E**, **G**, and **I**.

off. He worked himself past the point of exhaustion. And he produced tangible results that will benefit the United States tremendously by saving the U.S. taxpayer tens of millions of dollars. Thus, this case is at the opposite end of the spectrum from the garden-variety fraud case, and a downward variance and non-custodial sentence are warranted to avoid treating different types of fraud as equivalent.

As part of a district court's "obligation to consider whether a sentence other than a Guidelines sentence would be sufficient, but not greater than necessary, to serve the purposes of sentencing," district courts "have an obligation to consider whether to depart from the Guidelines sentencing range or to impose a non-Guidelines sentence in every case." *United States v. Corsey*, 723 F.3d 366, 382 (2d Cir. 2013) (Underhill, J., concurring); *United States v. Sanzhez-Garcia*, 565 Fed. Appx. 831, 833 (11th Cir. 2014) ("When a guidelines provision is not supported by empirical data and national experience, a district court does not abuse its discretion if it decides that a within-guidelines sentence is greater than necessary to achieve § 3553(a)'s purposes."). This duty "will frequently require judges applying the loss guideline to evaluate whether the calculated Guidelines range substantially overstates the seriousness of a crime." *Corsey*, 723 F.3d at 382; *see also* U.S.S.G. § 2B1.1, cmt. 21(C). Indeed, a court "may not presume that the Guidelines range is reasonable." *Gall v. United States*, 128 S.Ct. 586, 602 (2007).

Courts have increasingly recognized that, "unless applied with great care," the fraud loss guidelines "can lead to unreasonable sentences that are inconsistent with what § 3553 requires" and thus may require a significant downward variance. *Corsey*, 723 F.3d at 379 (Underhill, J., concurring). Courts in this Circuit have characterized the fraud loss guidelines as "not at all precise." *United States v. Lamonda*, No. 05-CR-131 (ORL), 2008 WL 68744, at *9 (M.D. Fla. Jan. 2, 2008), *aff'd*, 384 F. App'x 944 (11th Cir. 2010). As Judge Rakoff has explained, strict adherence

25

to the fraud loss guidelines can result in an "utter travesty of justice . . . from the guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense." *United States v. Adelson*, 441 F. Supp. 2d. 506, 512 (S.D.N.Y. 2006), *aff'd*, 301 F. App'x 93 (2d Cir. 2008). Moreover, in deciding to grant a substantial downward variance, *Adelson* noted that "there's a lack of empirical support for [the] fraud loss guidelines" and "that the way the fraud guidelines have been ratcheted up by a number of events also lead, at least in this case, to an unreasonable sentence." *United States v. Javat*, 18-CR-20668, ECF No. 500 at p. 11 (S.D. Fla. Dec. 16, 2019). That principle applies with particular force in this case.

Indeed, courts are to consider a downward variance in cases where, as here, the loss enhancement dwarfs the base offense level, distorting the resulting Guidelines range and overwhelming all other § 3553 factors. In *United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016), the Court questioned the wisdom of the fraud loss guidelines for this very reason. Judge Newman acknowledged that the district court's loss-related "increases complied with the Guidelines Manual," and that "the Commission had the authority to construct a set of guidelines that used loss amount as the predominant determination of the adjusted offense level for monetary offenses." *Id.* But Judge Newman cautioned that, while "[t]his approach, unknown to other sentencing systems, was one the Commission was entitled to take, . . . its unusualness is a circumstance that a sentencing court is entitled to consider." *Id.* The district court in *Algahaim* had increased one defendant's adjusted offense level from a base of 6 to 18, based on the loss amount, which the court observed was a "three-fold increase," and had increased the second defendant's adjusted offense level from a base of 6 to 16, based on the loss amount. *Id.* Noting the sharp increase was due to the fraud loss guidelines, the Second Circuit remanded for resentencing,

concluding that "[w]here the Commission has assigned a rather low base offense level to a crime and then increased it significantly by a loss enhancement, that combination of circumstances entitles a sentencing judge to consider a non-Guidelines sentence." *Id.*

Similarly, in *United States v. Javat*, the Court granted a downward variance, holding that the fraud loss amount overrepresented the seriousness of the offense and that the enhancements under the Guidelines combined in an "overly dramatic effect to produce a sentencing range that is comparable to that of defendants accused of the most egregious types of federal criminal offenses, of which this is not one." *United States v. Javat*, No. 18-CR-20668, ECF. No. 459 (S.D. Fla. Dec. 17, 2019). The Court refused to apply the sentence that corresponded with the application of the fraud loss guidelines, noting that the case "does not involve a fraudulent scheme resulting in actual theft from unsophisticated victims" and that the "fraud guidelines have been ratcheted up by a number of events also lead, at least in this case, to an unreasonable sentence." *Id.*

Here, the fraud loss guidelines would increase Dr. Gonzalez's adjusted offense level even more than they did in *Algahaim*. Indeed, the base offense level here is 6 (yielding a Guidelines sentence of 0-6 months), and the loss amount found by the Court would increase that level by 16, to 22 (before reducing it to 19 for acceptance of responsibility). Thus, as in *Algahaim* and *Javat*, this Court should grant a downward variance.

Part of the problem with the fraud loss guidelines is that the way in which they were developed renders them "fundamentally flawed, especially as loss amounts climb." *Corsey*, 723 F.3d at 380 (Underhill, J., concurring); *United States v. Johnson*, 16-CR-457-1 (NGG), 2018 WL 1997975, at *3 (E.D.N.Y. Apr. 27, 2018). Specifically, the fraud-loss table, unlike certain other sections of the Guidelines, "was not developed by the Sentencing Commission using an empirical approach based on data about past sentencing practices." *Corsey*, 723 F.3d at 379 (Underhill, J.,

concurring); *accord Johnson*, 2018 WL 1997975, at *3 (agreeing that "the loss Guideline 'was not developed by the Sentencing Commission using an empirical approach based on data about past sentencing practices'"); *United States v. Javat*, 18-CR-20688, ECF No. 459 (S.D. Fla. Dec. 17, 2019) ("I do think there's a lack of empirical support for those fraud loss guidelines."). As Judge Underhill explained:

> The history of bracket inflation directed by Congress renders the loss guideline fundamentally flawed, especially as loss amounts climb. The higher the loss amount, the more distorted is the guideline's advice to sentencing judges. As a well-known sentencing commentator has put it, "For the small class of defendants … convicted for fraud offenses associated with very large guidelines loss calculations, the guidelines now are divorced both from the objectives of Section 3553(a) and, frankly, from common sense. Accordingly, the guidelines calculations in such cases are of diminished value to sentencing judges."

*Corsey*, 723 F.3d at 380 (Underhill, J., concurring) (quoting Frank O. Bowman, III, *Sentencing High-Loss Corporate Insider Frauds After* Booker, 20 Fed. Sent'g. Rep. 167, 168 (2008)).

This is why courts have increasingly found that the fraud loss guidelines result in unreasonable sentencing ranges in cases where, like here, the Court has found a substantial loss amount. *See, e.g.*, *id.* ("Where the Sentencing Guidelines provide reasonable guidance, they are of considerable help to any judge in fashioning a sentence that is fair, just, and reasonable. But where, as here, the calculations under the guidelines have so run amok that they are patently absurd on their face, a Court is forced to place greater reliance on the more general considerations set forth in section 3553(a), as carefully applied to the particular circumstances of the case and of the human being who will bear the consequences."); *Javat*, 18-CR-20668, ECF No. 500 at p. 111 (departing downward in fraud case because "the way the fraud guidelines have been ratcheted up by a number of events also lead, at least in this case, to an unreasonable sentence."); *Johnson*, 2018 WL 1997975, at *3 (departing downward in a financial fraud case from 87-108 months to a non-

guidelines sentence of 24 months and observing that, "because the loss Guideline was not developed by the Sentencing Commission using an empirical approach based on data about past sentencing practices … district judges can and should exercise their discretion when deciding whether or not to follow the sentencing advice that guideline provides." (internal quotation marks omitted)); *United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012) ("By making a Guidelines sentence turn, for all practical purposes, on [loss enhancement], the Sentencing Commission . . . effectively guaranteed that many such sentences would be irrational on their face."); *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004) (noting that the Guidelines place "undue" and "excessive weight" on the loss amount) (Lynch, J.); *United States v. Ranum*, 353 F. Supp. 2d 984, 990 (E.D. Wisc. 2005) ("One of the primary limitations of the guidelines, particularly in white-collar cases, is their mechanical correlation between loss and offense level.").[20]

The loss guidelines are ill-equipped to consider the nature and seriousness of a particular offense because of "the weakness of the correlation between loss and moral seriousness; the rigidity of the loss amount overriding the diverse reality of complex financial crimes; the lack of any consideration of danger to society; and so on." *Johnson*, 2018 WL 1997975, at *4. As that

---

[20] This is why courts routinely impose below-Guidelines sentences in fraud cases. *See, e.g.*, *United States v. Roberts*, 15-cr-20187-CR-KING (S.D. Fla. Sept. 29, 2015), ECF No. 23 (ordering probation despite Guidelines range of 24-36 months); *United States v. Aldissi*, 14-cr-217-VMC-TGW (M.D. Fla. Mar. 20. 2015), ECF No. 487 (imposing 180 months of imprisonment despite Guidelines range of 324–405 months); *United States v. Xu*, 16-CR-000014-GAO-TBS (M.D. Fla. Aug. 1, 2017), ECF Nos. 74, 76 (imposing probation rather than Guidelines advising imprisonment); *United States v. Javat*, No. 18-CR-20668 (S.D. Fla. Dec. 16, 2019), ECF No. 459 (imposing sentence of 120-months despite Guidelines range that included life imprisonment); J. as to A. Livoti, *United States v. Livoti*, No. 08-cr-21158 (S.D. Fla. Apr. 1, 2014), ECF No. 1064 (imposing sentence of 120-months despite Guidelines range that included life imprisonment); J. as to H. Wilmore, 13-CR-60029 (S.D. Fla. July 4, 2014), ECF No. 572 (imposing sentence of 240 months despite Guidelines range of 324–405 months).

court noted:

> As far as this court can tell, the Sentencing Commission's loss-enhancement numbers do not result from any reasoned determination of how the punishment can best fit the crime, nor any approximation of the moral seriousness of the crime. . . . Given the feeble underpinnings of the loss enhancement, it is particularly galling that this factor is often more or less *solely* responsible for a white-collar offender's Guideline sentence. . . . I agree with Judge Underhill, and refuse to mechanistically impose such an illogical sentence. That this situation continues unabated is a great shame for many offenders sentenced under this Guideline who do not receive a sentence that makes any sense for the actual crime of conviction.

*Id.* at *3. Contrary to the Guidelines approach, not all loss amounts should be treated the same in terms of culpability because "not all actual loss is equally serious." *Corsey*, 723 F.3d at 381 (Underhill, J., concurring). Indeed, "[a] fraud that results in the loss of even a few thousand dollars by an elderly or sick person who, as a result of the loss, becomes unable to afford the necessities of life or medical care is much more serious than a fraud that results in ten or a hundred times that loss by a large corporation able to absorb the financial consequences without a need to close plants, fire employees or even declare the loss as material in public financial reports. Simply put, contrary to the assumption underlying the loss guideline, not all dollars of loss are fungible." *Id.*

As then-District Judge Lynch explained, "[i]n many cases, . . . the amount stolen is a relatively weak indicator of the moral seriousness of the offense or the need for deterrence." *Emmenegger*, 329 F. Supp. 2d at 427. In reality, "the particular amount stolen is not as significant," and "[w]ere less emphasis placed on the overly-rigid loss table, the identification of different types of fraud or theft offenses of greater or lesser moral culpability or danger to society would perhaps assume greater significance in assessing the seriousness of different frauds." *Id.* at 427–28.

The foregoing principles are especially applicable in this case, where the fraud loss guidelines greatly overstate the seriousness of the offense because the work contemplated here was completed and will result in spectacular savings to the United States. In sum, Dr. Gonzalez is

significantly less culpable than defendants who commit the "typical" frauds contemplated by the fraud loss guidelines, and a Guidelines sentence would vastly overstate the seriousness of the offense and result in an injustice. In contrast, a non-custodial sentence would adequately reflect the seriousness of the offense, promote respect for law, and provide just punishment.

I.      **The need to avoid unwarranted sentencing disparities among defendants supports a non-custodial sentence (§ 3553(a)(6)).**

One of the fundamental goals of the Sentencing Guidelines is to avoid sentencing disparities, so that similarly situated defendants are treated similarly. 18 U.S.C. § 3553(a)(6) ("[T]he need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."); *see also Booker*, 543 U.S. at 253–54 ("Congress' basic goal in passing the Sentencing Act was to move the sentencing system in the direction of increased uniformity. That uniformity does not consist simply of similar sentences for those convicted of violations of the same statute . . . .  It consists, more importantly, of similar relationships between sentences and real conduct, relationships that Congress' sentencing statutes helped to advance . . . .") (citations omitted).

A review of SBIR/STTR cases prosecuted around the United States makes clear that defendants situated similarly to Dr. Gonzalez are, without exception, sentenced to below-guidelines sentences and, routinely, sentenced to probation, including: two years probation (*United States v. Xu*, 16-CR-000014-GAO-TBS, ECF Nos. 74, 76 (M.D. Fl. Aug. 1, 2017)); six months home confinement and five years probation (*United States v. Anghaie*, No. 1:09-CR-00037-SPM/AK, 2011 WL 720044 (N.D. Fla. Feb. 21, 2011)); eight months probation (*United States v. Ghovanloo*, 2019 WL 10984527, 19-CR-00296 (SCJ) (N.D. Ga. Oct. 29, 2019)); 18-month pre-trial diversion (*United States v. Kashani*, 13-CR-00201 (DW), 2013 WL 6671672 (N.D. Cal. Dec.

18, 2013)); two years probation (*United States v. Han*, No. 2:18-CR-79 PPS-JEM (N.D. Ind. Nov. 23, 2020)); five years probation (*United States v. Near*, No. 1:14-CR-271 (N.D. Ga. Dec. 1, 2015), *aff'd* 708 F. App'x. 590 (11th Cir. 2017)); two years probation (*United States v. Lv*, No. 20-cr-00021-MN (D. Del. Feb. 3, 2021)); 18-month pre-trial diversion, including maintaining employment, reporting to a pre-trial services officer, 50 hours of community service, and abstaining from applying as a "Principal Investigator" for any U.S. grant (*United States v. Zhao*, CR-13-00201 DW, 2013 WL 6671672 (N.D. Cal. Dec. 18, 2013)); three-year deferred prosecution agreement (*United States v. Karimabadi*, No. 3:16-cr-00026 (S.D. Cal. Jan. 15, 2019)); six months of home confinement and one year of probation (*United States v. Asumu*, No. 6:14-cr-277 (M.D. Fla. Apr. 23, 2015)); three years of probation (*United States v. Morin*, No. 6:13-cr-689 (D.S.C. Feb 27, 2015)); one year of home confinement and five years of probation (*United States v. Lavid*, No. 2:04-cr-00456-SRC-01 (D.N.J. Nov. 9, 2005)); one year of probation (*United States v. Geng*, No. 8:16-cr-00558-GJH-1 (D. Md. Mar. 20, 2018)); three years' probation and 100 hours of community service (*United States v. Pottenger*, No. 1:11-cr-56-WJG-RHW (S.D. Miss. Nov. 4, 2011)); and two years of probation (*United States v. Tang*, No. 4:18-CR-40100 (D.S.D. Mar. 25, 2019)).

When courts have decided that a custodial sentence is necessary in SBIR/STTR cases, they have generally imposed sentences of less than one year, even following jury trials, including: four months' imprisonment following a jury trial (*United States v. Near*, No. 1:14-CR-271 (N.D. Ga. Dec. 1, 2015)); six months' imprisonment (*Anghaie*, 2011 WL 720044); three months' imprisonment (*United States v. Bensaoula*, No. 4:14-cr-00180 (S.D. Tex. Oct. 12, 2015)); six months' imprisonment (*United States v. Nayak*, 20-CR-144, 2022 WL 1433008 (E.D. Ky. May 5, 2022)); five months' imprisonment (*United States v. Starikov*, No. 4:14-cr-00180 (S.D. Tex. Oct.

9, 2015)); four months' imprisonment (*United States v. Hahn*, No. 5:16-cr-00015-DCR (E.D. Ky. June 16, 2016)); four months' imprisonment (*United States v. William*, No. 95-cr-40202 (N.D. Cal. Jan. 16, 1997)) (conviction later reversed); and four months' time served following bench trial and conviction of five felonies (*United States* v. *Zhang*, No. 7:17-cr-73, (W.D. Va Sept. 6, 2019)).[21]

Two very recent SBIR cases, with many striking similarities to the instant case, bear particular notice. In late 2020, Qingyou Han was sentenced to two years' probation after pleading guilty to wire fraud in an SBIR fraud case. *See* Sentencing, *United States v. Qingyou Han*, Case No. 2:18-cr-79 PPS-JEM (N.D. Ind. Nov. 23, 2020), ECF No. 124. Dr. Han was originally charged with mail and wire fraud for defrauding NSF by obtaining SBIR grant funds that totaled over $1.3 million. *See* Indictment, Qingyou Han, Case No. 2:18-cr-79 PPS-JEM (N.D. Ind. July 18, 2018), ECF No. 1. According to the Superseding Indictment, over an eight-year period from 2006 through 2014, Dr. Han: (i) wrote SBIR/STTR grant proposals using someone else's name and signature; (ii) falsely claimed a company would provide investment monies for the research to be conducted; (iii) used grant funds to purchase a family residence that his company then rented, thereby paying himself rent using grant funds; (iv) used grant monies to pay off the mortgage on his family home; (v) used grant funds to pay his school-aged children who were described as a "technical assistant"

---

[21] The one outlier is Mahmoud Aldissi and his wife, Anastassia Bogomolova, who were found guilty of conspiracy to commit wire fraud, wire fraud, aggravated identity theft, and falsification of records after a jury trial, and whose case involved numerous aggravating factors that distinguish it from Dr. Gonzalez's case.  In *United States v. Aldissi*, 758 Fed. App'x. 694 (11th Cir. 2018), the defendants, who sought over $24 million in government funds, "lied about their facilities, equipment [(no laboratories)], subcontractors, employees [(no employees)]), and eligibility; forged endorsements from respected scientists and industry specialists; and thereafter submitted falsified business records to officials investigating the fraud." *Id.* at 698. On top of that, the Aldissi's company—unlike Accelogic—was not even eligible to have received SBIR funding and did not have labs. *Id.* Although the Guidelines sentence for Aldissi and Bogomolova was between 324–405 months, Aldissi was sentenced to 180 months and Bogomolova to 156 months, a substantial downward departure of 7 levels.

and "secretary"; and (vi) submitted false time sheets and ledgers. Superseding Indictment, Qingyou Han, Case No. 2:18- cr-79 PPS-JEM (N.D. Ind. July 17, 2019), ECF No. 29. Mr. Han pled guilty to Count 1 of the Superseding Indictment, wire fraud in violation 18 U.S.C. § 1343, and admitted the majority of the allegations in the Superseding Indictment, specifically paragraphs 15-28. Id., Plea Agreement, Qingyou Han, Case No. 2:18-cr-79 PPS-JEM (N.D. Ind. Oct. 17, 2019), ECF No. 88. The Judge found a loss of $1,651,996, *see* Notice of Stipulation of the Parties Re: the Proper Calculation of the U.S. Sentencing Guidelines, Qingyou Han, Case No. 2:18-cr-79 PPS-JEM (N.D. Ind. Oct. 16, 2020), ECF No. 118, which resulted in a 16 point enhancement, for a total offense level of 25 and a guideline range of 57–71 months—higher than Dr. Gonzalez's Guideline range. *Id.* Nevertheless, Dr. Han was sentenced to two years' probation. *See* Sentencing, Qingyou Han, Case No. 2:18-cr-79 PPS-JEM (N.D. Ind. Nov. 23, 2020), ECF No. 124.

The second case is that of Pengcheng Lv, who in 2021, also pleaded guilty to wire fraud in connection to SBIR contracting fraud. *See United States v. Pengcheng Lv,* (*United States v. Pengcheng Lv*, 1:20-CR-00020-21 (D. DE. Feb. 16, 2021). The fact in *Lv* bear a striking resemblance to those here -- Lv admitted to overstating "(i) the number of AlphaSense's employees, and (ii) the identity of AlphaSense's employees, including by using the identities of people without permission and representing that they were AlphaSense employees that would work on the projects set forth in the proposals; [and misrepresenting the] subcontractors and consultants, including by (i) using the identities of University professors without permission [and by] using the identities of people [ ] without lawful authority, fraudulently modifying, creating, and editing . . . endorsements submitted with proposals . . .". *Id.* ECF 1. Although the Guidelines called for a sentence of between 27-33 months, the undeniable fact was that Lv, like Dr. Gonzalez,

did the work required of him to the satisfaction of the contracting officers. As a result, he received two years' probation. *Id.* ECF 23.

Neither of these cases were outliers. Government prosecutors have previously acknowledged the obvious: in SBIR fraud cases where the defendant has fully performed the scope of work—such as in this case—courts routinely give a below guidelines sentence:

> Indeed, as the government notes in its sentencing memorandum, 'it is a goal of the Guidelines to avoid unwarranted sentencing disparities,' and 'even in circuits ... that base loss on the full value of the contracts, it appears that sentencing courts routinely sentenced below the applicable Guidelines range—and often significantly below the range.' And 'when one examines the sentences actually imposed, it appears that regardless of whether loss for purposes of the Guidelines calculation is based on the full value of the contracts or some other metric, *the sentences ultimately imposed seem to be more consistent with loss being based on the profit that the defendants generated from the schemes.*'

*United States v. Singh*, 195 F. Supp. 3d 25, 33 n.4 (emphasis added) (citations omitted). In its Sentencing Memorandum in *Singh*, the government acknowledged that "[i]ndeed, *in nearly every reported case—and in nearly every unreported case of which the government has anecdotally learned—the sentencing courts that conclude that loss equals the full value of the contracts, have varied or departed downwards.*" Gov't Sentencing Mem. at 31, *United States v. Singh*, 195 F. Supp. 3d 25 (D.D.C. Mar. 21, 2016) (1:15-CR-00173), ECF No. 12 (emphasis added). This was the same reasoning used by the court in *United States v. Anghaie*, 1:09-cr-00037 (N.D. Fla.):[22]

---

[22] Dr. Anghaie, a nuclear and materials engineer, and his wife were convicted at trial of multiple counts of fraud related to federal grants paid to their small business, "NeTECH," under the SBIR/STTR Program. Among other conduct, the jury found the Anghaies guilty of submitting fraudulent proposals to obtain SBIR/STTR awards, making false representations in their final research reports, and creating fictitious employment records in response to an audit. In total, Dr. Anghaie and his wife, Sousan, were each convicted of over 25 counts of conspiracy and wire fraud. Although the conduct in the *Anghaie* case was <u>much more</u> extensive than here, the court in *Anghaie* went well below the Government's sentencing recommendation and the Guidelines, sentencing Dr. Anghaie to six months' imprisonment followed by six months' home confinement, and Mrs. Anghaie to six months' home confinement and five years of probation.

> This case is different from the typical fraud case because I am convinced that neither defendant intended to cause any injury to NASA, to the Air Force, or to anyone else. The defendants in this case are not professional contractors . . . I note that NeTECH actually provided valuable innovative research under the contracts to the agencies. The evidence shows that the agencies evaluated the work performed under the contracts with their highest marks. The agencies actually benefitted from the expertise of Dr. Anghaie . . . The gist of the offense lies in the fact that the contracts at issue were reserved for legitimate small businesses and the defendants knowingly made misrepresentations to qualify for those contracts."

Sentencing Tr. at 32:20-33:15, *United States v. Anghaie*, No. 1:09-cr-00037 (Apr. 24, 2012), ECF No. 238.[23]

A table listing each of these cases in more detail is attached for reference at **Ex. N**. A careful review of these cases leads to the conclusion that judges around the country, when faced with essentially SBIR contracting-fraud cases, where the defendant has provided value to the government, have not rigidly imposed the Guidelines. In every one of these cases, the sentencing judge made the determination that strictly applying the fraud loss guidelines would cause an injustice. Instead, in looking at the other § 3553(a) factors, judges have used a more common-sense approach and imposed sentences involving either no or minimal incarceration. The same approach should be taken here, and the Court should impose a non-custodial sentence of probation or home confinement.

1.      **Dr. Gonzalez's conduct was inconsistent with an otherwise law-abiding and rule-following life.**

Dr. Gonzalez has lived a life of accomplishment by virtue of an incredible work ethic, his innate intelligence and his drive to achieve. He is a devoted husband, father, and, as the dozens of

---

[23] The court also commented that "had the defendants made the same type of misrepresentations in the context of a private contract, at most the defendants would be facing civil liabilities to a degree much less than what they have already suffered." Sentencing Tr. at 34:7–11, *Anghaie*, No. 1:09-cr-00037 (Apr. 24, 2012), ECF No. 238.

letters[24] of support document, a close friend and mentor to countless others. As these letters attest, Dr. Gonzalez still maintains remarkable close contacts with more than a score of childhood friends from Colombia, who still speak with awe of his intelligence, sensitivity and kindness. The themes that run through these letters are consistent: Dr. Gonzalez is a man who cared little about money or material things, and, instead, has always been focused on scientific achievement while, at the same time, reaching out to help those in need. These letters provide vivid examples of Dr. Gonzalez's true nature:

- **Gonzalo R. Arce,** Professor of Electrical and Computer Engineering, University of Delaware: "I have always considered Juan a brilliant student, friend, and someone who has had an impact in the lives of many students he shared time with while at the university. . . He was not only brilliant mathematically and full of imagination, but he was also unique in many aspects. He had a special gift to connect with fellow students, to help them if needed . . . I was so impressed with Juan's educational background and in his human qualities that after his graduation, I made strong efforts to bring more students from Colombia to study in our doctoral program."

- **Mario M. Novelo,** longtime friend: "[Juan] was always a researcher and scientific entrepreneur. He never cared about money for personal use, because he always has seen money as a resource to do good deeds and leave a positive mark in the world. . . . He was not moved . . . by economic motivations."

- **Santiago Hidalgo Ocampo,** student mentee: "[Dr. Gonzalez's] passion for teaching and transferring his knowledge to a group of young people was remarkable. I could personally see that in addition to this passion for teaching, he was a patient person and actively interested in me being able to learn the different concepts properly. He loves to make people grow."

- **Rodrigo Guarin Narvaez,** lifelong friend of 41 years: "[D]espite having these great achievements . . . his personal humility have always been in his heart, because he lived in a middle-class house. I also noticed that their expenses have never been ostentatious or excessive. He never cared about having sumptuous material possessions, such as high-end cars or special luxuries . . . Juan as always been concerned with improving the lives of others and solving problems or concerns of others – be it persons or communities. . . . [H]e is a person who is not interested in economic factors, that his pillars do not lie in the financial system but in the social and spiritual one."

---

[24] See **Ex. O**, for collection of letters of support.

- **Diego Fernando Reyes Millan,** lifelong friend of 48 years: "[Juan] has stood our for his selfless help towards people. His leadership has made him a role model. [He] has been able . . . to donate his time to charitable causes, and support among others, groups of students such as those of the EAFIT University in the International Supercomputer Competition ASC . . . he managed to position Colombia as the third best team in the world…. One of [his] great passions is any activity in which he can, as he says, 'sow seeds' in the minds and souls of young people. He has a great passion for helping people grow. It is his obsession, and he spares no opportunity to educate and cultivate people, whether they are friends or strangers."

- **Luz Adriano Prieto Tabares,** life-long friend of over 43 years: "[Juan] is a very intelligent person, but at the same time with a great heart, and ingenuity, seeking that all those people who work with him grow, and demand the most of themselves, to give the best of themselves, to achieve efficient work teams, to meet their scientific goals. He is a persevering, fair-minded, consistent, tireless, honest and extremely sensitive person.'"

- **Jorge Quintero,** friend of 16 years: "[Juan] doesn't care about money or luxury things, he wants to change the world. He could have gone to the private sector and sell his inventions, but he knew the big federal agencies will do the right thing with them. He could have been a millionaire, instead he decided to be a good human being. . . It is hard to believe that somebody that smart and involved in that level of technology can be so humble and human."

- **Hamid Hussein,** life-long friend of 50 years: "[R]ecently, [Juan] went to Colombia to train and guide a group of underserved university students all the way to win important recognitions in a prestigious international competition in computational science, an achievement they have never thought possible before. [Juan] showed them the full potential of what they could achieve by opening for those students a world with new horizons and possibilities . . .I never knew him seeking luxuries or excesses, he lived modestly, didn't own a car for a long time in favor of public transportation, had a clear dislike for notoriety, had his heart and aspirations on solving big problems, making big discoveries that will help humanity, and leaving his mark."

- **Dr. Daniel Lau,** Professor and Director of Graduate studies in the Department of Electrical and Computer Engineering at the University of Kentucky, and fellow graduate student of Dr. Gonzalez: "[T]he one thing I will say about Juan is that he is my role model…. I continue to guide my behavior by constantly asking myself if what I am doing is professional. I continue to guide my graduate students on their papers in ways Juan guided me . . . One can easily see Juan's influence in everything I do professionally today . . ."

- **Vincent Alejandro Arcilla Larrea,** Undergraduate at EAFIT University and mentee: "[I am] proud to regard Juan Gonzalez as a mentor . . .He created a flash course of 4 weeks of high performance computing specifically tailored for our team, just to that it would help us in our preparation. . . . Each class took him a couple of hours to prepare, and we learned a lot thanks to this course . . He was simply happy to help…. He would spend hours and hours with me, almost every day of the week, teaching me and mentoring me about subjects

beyond technical knowledge. . . there were days we would start our training session at 8 p.m. and work up to 2:00 a.m. just by being so immersed in our work that those hours felt nothing like work . . .He always showed a positive and proactive attitude even at times that were high on stress and anxiety . . . Juan [ ] taught me how to stay focused even on hard times. . . . Juan made subtle but long-lasting changes to my life. I have learned how to be a better leader; how to be a better engineer; how to have the right mindset . . . Juan even spent his own money to purchase computing resources so that we could train and conduct experiments…he did not only care about our results, but on how each of us could improve personally…He wanted to teach us so that we cold teach other students at our university . . . he is always looking for a way in which his actions can have the most notable impact on society…Juan has been [ ] a mentor that has inspired me in so many ways, that I . . . just feel blessed I had the chance to meet him."

- **Luiz Enith Banderas,** life-long friend of 40 years: "I have [ ] been able to . . . to see how he has dedicated himself body and soul to developing these projects that he is so passionate about . . . he has never hesitated to invest all his savings in his research . . . He has always made these investments in the most generous way possible, to the point of living modestly because money for luxuries or personal enrichment is not, and has not been, what motivates him."

- **Julio Cesar Bonilla Perez,** life-long friend of 46 years: "Juan has always been a hard worker, and always his main value has been to help others without looking for any personal gain, looking for a better future for everybody. An example of this can be seen in the support he gave to some students from the EAFIT University in Medellin during a supercomputer event in Asia . . . Juan was always there to support them and guide them towards a great outcome.

These letters, and dozens more, demonstrate Dr. Gonzalez's extraordinary loyalty, generosity and kindnesses that he has shown over his lifetime. It is a rare testament that anyone of Dr. Gonzalez's age still maintains such a vast number of devoted, life-long friends.

### 2.    Dr. Gonzalez has already paid an enormous price for his conduct.

Even before serving whatever sentence the Court imposes, Dr. Gonzalez has already suffered the consequences for his conduct. The business that Dr. Gonzalez built from scratch and nurtured for the past 17 years is virtually bankrupt with no ongoing business or revenue streams, and no prospects for anything better. The sterling reputation Dr. Gonzalez spent a lifetime building in the engineering community is gone, as is Accelogic, the business Dr. Gonzalez started and built.

The financial impact of this case and plea have been devastating for Dr. Gonzalez. Both

Dr. Gonzalez and his wife worked at Accelogic. Therefore, as a result of this investigation and conviction, when the business shuttered, the family lost all of its income. The family, which includes the Gonzalez's teenage daughter, faces very dire prospects ahead—particularly if this Court were to decide that a period of incarceration is necessary. Because of the reputational harm caused by the guilty plea in this case, Dr. Gonzalez faces the reality of a greatly reduced earning potential for the rest of his life. This means that Dr. Gonzalez will likely always be in a precarious financial position. Dr. Gonzalez will not be able to bid for a government contract ever again, and getting hired as a convicted felon is extremely challenging. The family has already lost its health insurance, which is, naturally, terrifying for them. Dr. Gonzalez's psychiatrist noted the devastating effect this prosecution has already had on his mental health and that of his family:

> An important aggravation factor is that the legal situation has also affected severely the mental health of his wife, daughter, and several of his employees. His daughter has become incapacitated due to anxiety, and she has not been able to attend school of any kind (not even home schooling) for the last two years. . . . [and that ] the prolonged (4 years) uncertainty of the legal situation, has had a severe deleterious effect on his mental health. . . . During the last year, the situation has become more complex as the legal process has also led to financial ruin, loss of assets, heavy debt, loss of reputation, and loss of employability, which result in uncertainty-triggered pain that is aggravated by the obsessive personality traits, and intensifies the symptoms of depression, anxiety, and anhedonia. Mr. Gonzalez has begun to drink alcohol as a response to the pain of the extended uncertainty.

*See* **Ex. J**.

The devastating impact of this conviction is not limited to financial and health consequences. The notoriety and opprobrium associated with a criminal conviction of this nature for a professional engineer means that Dr. Gonzalez will never have (or be able to regain) the life he had. It is over. And that is the case regardless of the sentence ultimately imposed. These consequences, too, are a form of punishment. *See, e.g.*, *United States v. Anderson*, 533 F.3d 623, 633 (8th Cir. 2008) (upholding below-Guidelines sentence in part because district court found that

"defendant had suffered atypical punishment such as the loss of his reputation and his company");
*United States v. Anderson*, 267 F. App'x 847, 850 (11th Cir. 2008) (affirming a below-Guidelines
sentence in part because defendant suffered loss to his professional reputation and lost his high-
paying job); *United States v. Jasen*, 15-CR-00214, (M.D. Fla. Jan. 28, 2016), ECF No. 86 at pp.
53-54 (imposing probation because, in part, "one who makes a mistake in judgment…should be,
in my judgment, absent other aggravating circumstances, be able to go on with their life and suffer
the humiliating and devastating effects of being prosecuted…which will… harm your reputation,
your social status…"); *United States v. Malik*, 424 F. App'x 122, 127 (3d Cir. 2011) (affirming a
below-Guidelines sentence in part because the defendant "was punished by the reputational harm
he suffered as a result of the criminal action"); *United States v. Redemann*, 295 F. Supp. 2d 887,
894–97 (E.D. Wis. 2003) (downward departure warranted where defendant suffered serious
collateral consequences from conviction); *United States v. Samaras*, 390 F. Supp. 2d 805, 809
(E.D. Wis. 2005) (imposing below-Guideline sentence in part because, "as a consequence of his
conviction and sentence, defendant lost a good public-sector job, a factor not considered by the
Guidelines."); *United States v. Anghaie*, 09-CR-0037 (N.D. Fla. Nov. 29, 2011), ECF No. 238
(imposing below-Guidelines sentence and noting that defendants "received significant punishment
through financial loss, loss to reputation and career opportunities.");*United States v. Vigil*, 476 F.
Supp. 2d 1231, 1315 (D.N.M. 2007) (in considering justness of sentence, "it is important to
consider all other forms of punishment [defendant] has already suffered," including loss of job and
damage to his personal and professional reputation); *United States v. Olis*, Criminal No. H-03-
217-01, 2006 WL 2716048, at *13 (S.D. Tex. Sept. 22, 2006) (substantial variance warranted in
part because "the attendant negative publicity, the loss of his job and accounting and law licenses,
and the need to provide support for his family will provide adequate deterrence against any

potential future criminal conduct.").

J.     **Charitable works**

Despite the exhausting hours Dr. Gonzalez worked on his SBIR contracts, he still managed to find the time to mentor young engineers. One recent Dr. Gonzalez's mentorship with EAFIT University in Medellin – one of the top universities in Colombia – began in late 2020, when Dr. Gonzalez was introduced to the scientific team by a mutual friend and Dr. Gonzalez decided to open a project inside the University, which he sponsored through Accelogic. The idea was to teach a novel course on the science of Compressive Computing. At the time, the students were competing in the biggest supercomputing competition (ASC2020-2021), and after about two months of training with Dr. Gonzalez, the EAFIT team learned that they qualified for the World's finals - a huge achievement.

Dr. Gonzalez drilled with the team extensively, and built a deep and lasting rapport with them. He instilled a confidence and belief in the team that they belonged on this world stage with more developed nations. A huge hurdle they had to overcome was a lack of access to state of the art equipment. Dr. Gonzalez addressed this shortfall by using his own funds to rent the best supercomputing equipment for the team to train on.

The weeks of hard work and training paid off, and the team finished third in the world, a result that stunned the scientific world and was reported all over the media in Colombia. For those on the team, it was a life-changing experience. *See* https://blogs.portafolio.co/negocios-e-inspiracion/estudiantes-eafit-ganaron-asia-supercomputer-challenge-2021/; https://www.eafit.edu.co/noticias/agenciadenoticias/2021/Eafitenses-lograron-tres-reconocimientos-en-competencia-internacional-de-supercomputo.

All of the hundreds of hours spent by Dr. Gonzalez – not to mention his financial contributions – were uncompensated. He did this simply because he wanted to help these Colombian students realize a dream. Charitable work such as this is, in and of itself, deserving of a downward departure pursuant to USSG § 5H1.11 (Military, Civic, Charitable, or Public Service; Record of Prior Good Works). *See United States v. Canova*, 412 F.3d 331 (2d Cir. 2005) (affirming a downward departure for an ex-Marine who as a volunteer firefighter, rescued a small child from a burning building, delivered three babies and administered CPR to persons in distress): *United States v. Huber*, 462 F.3d 945 (8th Cir. 2006) (affirming a downward departure for a defendant who had loaned money to neighbors and fellow farmers in need, saving farms from foreclosure); *United States v. Cooper*, F.3d 172 (3d Cir. 2005) (allowing a downward departure for community service that was "hands-on" and likely had a dramatic and positive impact on the lives of others).

**K.**   **A non-custodial sentence affords adequate deterrence to would-be SBIR program fraudsters (§ 3553(a)(2)(B)).**

It seems inconceivable that other scientists that seek SBIR contracts would not be adequately deterred by the knowledge that they, like Dr. Gonzalez, would be a convicted felon—with all that designation entails—by misrepresenting who would work on a contract and permitting unauthorized how much work certain individuals would do on a contract or by permitting unauthorized non-U.S. persons to work on the contract.

As a result of pleading guilty in this case—regardless of the sentence imposed—Dr. Gonzalez has already lost virtually everything for which he spent his life working: his career; his reputation; his business; his prospects for future earnings and he now is responsible for $1.7

43

million in restitution.[25] As a consequence of the federal investigation,  he has had to grapple for the past four years with the prospect of being separated from his family, for whom he is the primary means of financial and emotional support. The investigation has also resulted in the three members of the family having to endure severe deterioration of their mental health, with grave consequences that will continue to affect them for years to come. All of these outcomes are a direct consequence of this prosecution irrespective of any period of incarceration. No scientist or engineer would consider these consequences and believe that committing SBIR fraud to obtain contracts is a worthwhile risk. Any rational being would be deterred by these consequences. (And irrational actors cannot, by definition, be deterred, as they will not consider the consequences of their conduct.) Thus, this factor does not support a custodial sentence, let alone one within the Guidelines range.

### L.   A non-custodial sentence is warranted because Dr. Gonzalez poses no threat to the public (§ 3553(a)(2)(C)).

With the exception of the present criminal proceeding, Dr. Gonzalez has never been accused of wrongdoing. As such, nothing in his past suggests any criminal tendencies. As a result of his conviction and government-wide debarment, Dr. Gonzalez will not be able to work in his chosen profession and thus cannot reoffend. There is, therefore, no risk of recidivism. Thus, this factor does not support a custodial sentence, let alone one within the Guidelines range.

---

[25] Given that Dr. Gonzalez's debts far exceed his assets, and that he has no current employment prospects, the Court should "find from facts on the record that the economic circumstances of the defendant do not allow the payment of any amount of a restitution order, and do not allow for the payment of the full amount of a restitution order in the foreseeable future under any reasonable schedule of payments" and "direct [Dr. Gonzalez] to make nominal periodic payments" subject to periodic review of his financial condition. *See* 18 U.S.C. § 3664(B).

**M.**    <u>A non-custodial sentence is warranted because Dr. Gonzalez requires no correctional treatment (§ 3553(a)(2)(D)).</u>

Dr. Gonzalez does not require any educational or vocational training, medical care, or other correctional treatment that would warrant a custodial sentence, let alone one within the Guidelines range. This supports a sentence without incarceration.

**N.**    <u>A non-custodial sentence is available and warranted (§ 3553(a)(3)).</u>

Under § 3553(a)(3), the Court must consider "the kinds of sentences available" when determining an appropriate sentence, and the Court has complete discretion to impose a non-custodial sentence, such as probation or home detention. The Court also has discretion to impose conditions to such a sentence that are in the public interest.

Courts have recognized that it can be in the public's best interest to impose a non-custodial sentence on a defendant who, like Dr. Gonzalez, has significant abilities. For instance, in *United States v. Smith*, No. 1:06-CR-00394, 2009 WL 249714 (N.D. Ohio Feb. 2, 2009), the court explained that community service would put the defendant's skills as an accountant and lawyer to better use than prison and that the defendant's "abilities . . . would otherwise be wasted during a more lengthy prison term." *Id.*, at *4. Other courts have agreed. *See, e.g.*, *United States v. Warner*, 792 F.3d 847, 854 (7th Cir. 2015) (affirming sentence of two years of probation despite Guidelines range of 46-57 months where district court found that "society will be best served by allowing [the defendant] to continue his good works outside of prison.") (internal quotations omitted); *United States v. Coughlin*, No. 06-CR-20005, 2008 WL 313099, at *7 (W.D. Ark. Feb. 1, 2008) (imposing a sentence of home confinement, five years of probation, and 1,500 hours of community service to company executive despite Guidelines range of 27-33 months in part because his "expertise is better put to use than wasted in the physical deterioration of unnecessary imprisonment"). Recently, Judge Analisa Torres sentenced Dr. Alexander Neumeister, a prominent neurological

researcher at Yale and New York University ("NYU"), who pled guilty to stealing from NYU and various grant programs from 2012-2014, to three years' probation and to play the piano for an hour at least twice a week for three years for elderly group facilities after being alerted to Mr. Neumeister's background as a trained pianist in the pre-sentence investigation report. *See* Tr. of Proceedings as to A. Neumeister, *United States v. Neumeister*, No. 18-cr-385 (AT) (S.D.N.Y. Nov. 7, 2018), ECF No. 42.

A non-custodial sentence is in the public's and Dr. Gonzalez's best interest. In this case, a sentence of probation with other conditions—such as community service, including for example in the form of Dr. Gonzalez helping young local scientists or students with academic papers or lab work—would benefit society far more than sending Dr. Gonzalez to prison and thereby cutting off his family's sole source of income and, with it, their health insurance.

**O.       The impact of Incarceration on Dr. Gonzalez's Family.**

A separate ground for downward variance, made pursuant to § 5H1.6, is the extraordinary fragile mental health condition of Dr. Gonzalez's teenage daughter and his wife, Ana. The United States Court of Appeals for the District of Columbia Circuit has observed, "[W]e see nothing unreasonable in the Commission's view that 'mitigating circumstances' include factors unrelated to moral blameworthiness," and recognized family ties and responsibilities as one such factor. *United States v. Smith*, 28 F.3d 649, 652 (D.C. Cir. 1994) (internal citations omitted).

In *Lehmann,* the Sentencing Guidelines called for a sentence of incarceration of between 37-46 months—the same as in this case—based on the defendant's conviction for unlawful possession of a firearm by a convicted felon. *United States v. Lehmann*, 513 F.3d 805, 806 (8th Cir. 2008). The trial court imposed a sentence of probation based on expert testimony that incarceration of the defendant would adversely affect the emotional development of the defendant's child. *Id.* at

809. In *United States v. Sclamo*, the trial court imposed a sentence of probation where the government recommended a 28-month sentence and 36 months of supervised release. *United States v. Sclamo*, 997 F.2d 970, 972 (1st Cir. 1993). The court based its decision on evidence presented that the child's "condition will deteriorate if defendant is incarcerated" and the child "would risk regression and harm if defendant were incarcerated. . . ." *Id.* at 974.

The adverse impact that any period of incarceration would have on Dr. Gonzalez's daughter warrants the requested downward variance. As the letters from both hers and Dr. Gonzalez's psychiatrists note, the daughter suffers from severe depression and anxiety. In spite of being a brilliant student in the past, she has been confined at home without being able to do any type of schooling (not even home schooling) for the past two years; a large extent due to the severe effect that the federal investigation has had on the entire family. Incarceration would mean Dr. Gonzalez's daughter would lose her father at precisely the time when she needs him the most - this would  have a devastating impact on her. The dangers here cannot be overstated, as the daughter has previously had suicidal ideation.

       **P.**       <u>**The COVID-19 Pandemic must me considered before imposing a sentence.**</u>

Additionally, when determining the types of sentences available, the Court should consider the COVID-19 pandemic that has ravaged not just the nation, but, also, in particular, the prison system. Although vaccines have obviously helped significantly in reducing the number of cases and deaths from COVID-19, the fact remains that COVID-19 has dramatically changed how prisons must operate to the detriment of inmates.

Although the health threat of COVID-19 has significantly lessened in the past two years, the Bureau of Prisons has taken aggressive steps to help avoid the spread of the disease. While these preventive measures are understandable and can be at least moderately effective, the result

is a draconian sentence for inmates committed to minimum security facilities compared to the "normal" minimum security experience.

If a period of incarceration is ordered, the Bureau of Prisons would almost certainly designate Dr. Gonzalez as "low risk" given his lack of criminal history and the nature of his offense. As a result, he could expect to be designated to a minimum security facility. Typically, such facilities permit inmates to work, exercise, and move about with relative freedom, and family is permitted to visit weekly. However, this is no longer the case. The vast majority of federal prisons are now operating at Level 3, meaning maximum precautions are being taken. This means that social distancing is required in all areas, which dramatically limits recreation and any social interactions. New inmates to a facility must quarantine for a substantial period, which essentially requires that the inmate be locked down 24 hours a day for three weeks, and no calls to family or visits are permitted. Nor are inmates permitted to leave their cells to recreate, and they are only allowed to shower thrice per week. After the initial quarantine, movement is much more restricted and work opportunities are very limited, and most critically, family visits are prohibited indefinitely. Given the current spread of COVID-19 in society, it is highly unlikely that any family visits will be permitted until far into the future. Instead, inmates are locked down most of the day.

In sum, any period of incarceration that this Court imposes will be far more onerous than what would be typical for an inmate like Dr. Gonzalez. This reality was recently recognized by the Court in *United States v. Shi*, 1:17-cr-00110 (CRC) (D.D.C. Sept. 14, 2020), which, after considering all of the Section 3553 factors, ordered Dr. Shi released from prison early because of the onerous COVID-related restrictions imposed by the Bureau of Prisons:

> "[T]he Court fashioned [its original, 16-month] sentence on the assumption that Dr. Shi would be designated to a minimum- (or at least low-) security facility, as has been the Court's experience with similarly–situated defendants. Consistent with

that assumption, BOP initially designated him to a minimum-security camp at FCI Three Rivers. The landscape looks far different now. . . . The unexpected severity of Dr. Shi's prison experience has upset the careful balance the Court attempted to strike at sentencing: The harsh conditions do not fit his crime. . . Requiring him to serve out the remaining months of his term is unnecessary to deter future potential offenders. Finally, alternatives to incarceration exist to achieve the purposes of the original sentence, namely, home confinement until the beginning of his term of supervised release."

Mem. Op. & Indicative Ruling, *Shi*, 1:17-cr-00110 (CRC), ECF No. 380.

The rationale of the Court in *Shi* applies here as well: viable alternatives to incarceration—such as home confinement—are available to the Court instead of a severe, potentially life-threatening sentence that would require isolation and almost certainly no family visits for the duration of the sentence.

## III.   <u>CONCLUSION</u>

Dr. Gonzalez not only has no criminal history; he has no prior *arrests*. There can be no serious suggestion that Dr. Gonzalez is at risk to re-offend. A non-custodial sentence is appropriate and justified. Such a sentence is no "slap on the wrist": the life that Dr. Gonzalez knew prior to his arrest is over, forever. He is now a felon—a label that he will be forced to wear for the rest of his life. He and his family have already endured great psychological trauma during the last four years, with everlasting consequences for all of them. His daughter's mental health is in an extremely crippling condition that has already resulted in almost two years of total inability to function, with no optimistic prognosis for the near future. Now that the investigation is finally over, she will have a chance at recovering, and this is precisely the moment when she most needs her father. In the circumstances of this case, a non-custodial sentence is sufficient  to satisfy the statutory purposes of sentencing.

Dated:  September 6, 2022                              Respectfully submitted,


                                                      /s/ Flynn Bertisch
                                                      Flynn P. Bertisch
                                                      Fla Bar ID #0605808
                                                      Law Offices of Flynn P. Bertisch  P.A.
                                                      224 Datura St.
                                                      Ste. 1004
                                                      West Palm Beach, Florida 33401
                                                      flynn@bertischlaw.com
                                                      Tel: 561-619-7346

                                                      Peter R. Zeidenberg (*pro hac vice*)
                                                      ArentFox Schiff LLP
                                                      1717 K St NW
                                                      Washington, DC 20006
                                                      Peter.zeidenberg@afslaw.com
                                                      Tel: 202-857-6000

                                                      *Attorneys for Defendant*




### CERTIFICATE OF SERVICE

     I HEREBY CERTIFY that on September 6, 2022, a true and correct copy of the foregoing has been electronically filed with the Court and served to all counsel of record via CM/ECF.



                                                      /s/ Flynn Bertisch
                                                      Flynn P. Bertisch