**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 22-60101-CR-CANNON/REINHART**

**UNITED STATES OF AMERICA**

> **vs.**

**JUAN GUILLERMO GONZALEZ,**

> **Defendant.**
> _____/

**UNITED STATES' RESPONSE TO DEFENDANT'S OBJECTIONS TO PRESENTENCE INVESTIGATION REPORT AND REQUEST FOR DOWNWARD VARIANCE [DE 24] AND SENTENCING MEMORANDA IN SUPPORT OF NON-CUSTODIAL SENTENCE [DE 28, DE 29]**

**COMES NOW** the United States of America, by and through the undersigned Assistant United States Attorney, and hereby files this Response to the Defendant's Objections to the Presentence Investigation Report ("PSI"), which includes a request for downward variance (DE 24),[1] and the Defendant's Sentencing Memoranda in Support of Non-Custodial Sentence (DE 28 and DE 29).   For the reasons set forth below, the United States respectfully requests that the Court deny the Defendant's requests for variance and impose a sentence within the advisory guideline range, that is, to a sentence of 46 months' imprisonment, to be followed by a two-year term of supervised release, and restitution of $1,749,776.80, with no additional fine.[2]   The United States

---

[1] After conferring with counsel for the Defendant and the Probation Officer, it appears that the Defendant's Objections have been resolved in the Amended PSI and Addendum, so this Response will only address the request for downward variance contained in DE 24.   At the sentencing hearing, the only remaining guideline issue to be resolved is whether a two-level enhancement applies for sophisticated means, pursuant to U.S.S.G. § 2B1.1(b)(10).   The United States objected to the original PSI, which did not include the enhancement.   In the Amended PSI, the Probation Officer agreed with the government's position.   The defendant believes that the enhancement should not apply.

[2] As explained below, the United States recommends this sentence, even if the Court were to decide

further requests that the Court order forfeiture, in accordance with the unopposed Motion for Preliminary Order of Forfeiture (DE30).

## <u>INTRODUCTION</u>

The 46-month sentence of incarceration produced by the correct calculation of the Sentencing Guidelines is the appropriate and reasonable sentence in this case – the sentence that is "sufficient, but not greater than necessary" to address defendant Gonzalez's egregious behavior and to accomplish the sentencing goals advanced in § 3553(a)(2).  *Kimbrough v. United States*, 552 U.S. 85, 101 (2007).   Defendant Gonzalez's 51-page sentencing memorandum consists entirely of iterations of "the ends justify the means" and "no harm, no foul," and it asks the Court to impose a sentence that the Eleventh Circuit has described as a "gentle pat" on the wrist rather than a sentence that adequately considers all the factors in § 3553(a).

What Gonzalez's sentencing memorandum fails to even recognize is the harm his actions caused to the purposes and goals of the SBIR and STTR programs – which are to spur the American economy and American ingenuity by providing funds for employment and development of U.S. citizens and legal permanent residents (referred to as "U.S. persons" in the contracts and regulations).   Gonzalez neglects to mention the educations institution and consultants who were supposed to receive some of the funds that Gonzalez obtained through fraud and kept for himself. He also neglects to mention the U.S. businesses who would have received these contracts but for Gonzalez's fraud.   Gonzalez pooh-poohs the security risks caused by his actions, which included giving access to sensitive government software and data to a professor and his students at a Venezuelan public university.

---

that the sophisticated means enhancement does not apply.

The failure to address these harms leads to the main flaw in Gonzalez's analysis – he asks the Court to sentence him as if he had been convicted of wire fraud, false statements, or false claims, rather than for his crime of conviction – aiding, abetting, counseling, commanding, and inducing non-U.S. persons to intentionally access a computer without authorization and thereby obtain information from the Department of the Army, the Missile Defense Agency, the Defense Advanced Research Projects Agency, and the National Aeronautics and Space Administration, for purposes of commercial advantage and private financial gain, in violation of 18 U.S.C. §§ 1030(a)(2), (c)(2)(B)(i), and 2.   Under the proper analysis of the facts and circumstances of the offense and the other § 3553(a) factors, the government respectfully submits that a 46-month sentence should be imposed.

## FACTS AND PROCEDURAL HISTORY[3]

After a multi-year investigation and lengthy efforts to resolve the case pre-charge, on May 17, 2022, defendant Juan Guillermo Gonzalez ("Gonzalez") was charged via Information with one count of aiding, abetting, counseling, commanding, inducing or procuring several non-U.S. persons to intentionally access a computer without authorization and thereby obtain information from several U.S. agencies, that is, the Department of the Army, the Missile Defense Agency, the Defense Advanced Research Projects Agency, and the National Aeronautics and Space Administration, for purposes of commercial advantage and private financial gain, in violation of 18 U.S.C. §§ 1030(a)(2), (c)(2)(B)(i), and 2 (DE1).   On the same day, an Information was filed charging Accelogic LLC and Intellectual Property Systems, LLC ("Intellep") – two corporations that Gonzalez founded, owned, and controlled – with conspiracy to defraud those same agencies,

---

[3] The facts contained in this section are taken from the agreed factual proffer (DE 16).   In the Argument section, *infra*, the government will address some of the "facts" woven into the defendant's sentencing memorandum and some of his exhibits, and will introduce facts that contradict the defendant's statements.

as well as the Department of the Air Force and the Department of Energy, via the use of wires, in violation of 18 U.S.C. § 1349 (S.D. Fla. Court File No. 22-80080-Cr-AMC, DE 1).

The charges of computer intrusion and wire fraud conspiracy arose from Defendant Gonzalez's and Accelogic's years-long acquisition of government contracts and grants via the Small Business Innovation Research Program ("SBIR") and Small Business Technology Transfer (STTR) Program.  As defendant Gonzalez admitted in his Factual Proffer, the SBIR and STTR programs were highly competitive programs set up to encourage small U.S.-based businesses to engage in federal research and development with the potential for commercialization and to stimulate the U.S. economy (DE 16 at 11-12).  For those reasons, and due to the sensitive nature of some of the research undertaken as part of the programs, the contracts specified that all research and development work sponsored by the contracts needed to take place inside the United States (*id.*).  Some of the contracts also specified that certain types of work could only be performed by "U.S. persons," which was defined as United States citizens and legal permanent residents only (*id.*).  Throughout the period charged in the Information, the Defendant was a legal permanent resident of the United States (*see* Rev. PSI at ¶ 121), so he was considered a "U.S. person" for purposes of the SBIR and STTR programs.

For all of the contracts and grants that were awarded to Accelogic, the Defendant oversaw the preparation of the proposals; he approved the submission of the proposals; he was listed as the Principal Investigator; and he either handled all negotiations himself or authorized and delegated the negotiations to trusted persons (DE 16 at 12).  As Principal Investigator, the Defendant also conducted research and development and oversaw others' work on the SBIR and STTR contracts (*id.*).  The Defendant was also responsible for deciding which Accelogic employees and consultants would work on the contracts (*id.*).

Accelogic was awarded each of the contracts charged in the Information based on proposals drafted and submitted by the Defendant, that is: (1) a 2015 proposal for an Army contract valued at $159,993, entitled "Industrial-Quality Porting of the Army's Helios CFD Code into Xeon-Phi Enabled Systems – A Process-Based Approach for Maximal Speedup"; (2) a 2017 proposal for a Missile Defense Agency contract valued at $154,987.86, entitled "Industrial-Quality Acceleration of MDA's Missile Defense Simulation Infrastructures – A Novel Theory of Optimal Data Compression Inspired on the OSF"; (3) a 2016 proposal for a Defense Advanced Research Projects Agency contract valued at $1,510,000, entitled "Enabling Extreme Acceleration of Graph Analytics in Real-World Applications"; and (4) a 2015 proposal for a NASA contract valued at $755,000, entitled "Accelerating Memory-Access-Limited HPC Applications via Novel Fast Data Compression"  (DE 16 at 12-17).  In each of the proposals, Accelogic—via the Defendant or someone supervised by the Defendant—confirmed that all work on the contract would take place inside the United States and promised either that no non-U.S. persons would work on the contract or that any non-U.S. person would be disclosed to the contracting agency (*id.*).

The concerns about conducting all work inside the United States and about disclosure to non-U.S. persons were significant to the contracting agencies.   For example, two of the Army's evaluators of the proposal expressed concern that [R.N.] had been proposed as a key staff member, noting that, "One member of proposed key staff is H1B foreign national, may restrict access to ITAR[4] codes"; and "One of the proposed collaborators is a foreign national on H1B status. Because Helios is subject to export control restrictions this individual may get limited access to Helios" (DE 16 at 13).   The Army awarded the contract to Accelogic, but during the negotiations

---

[4] "ITAR" refers to the "International Traffic in Arms Regulations," which appear at 22 C.F.R. Parts 120 through 130.

of the final contract, the Defendant confirmed that all work would be performed in the United States, and the contract incorporated by reference the ITAR and EAR[5] restrictions on using foreign nationals and not allowing work outside the United States (*id.*).   As part of Accelogic's work for the Army, the Defendant, on behalf of Accelogic, signed a software license agreement with the Department of Defense (represented by the High Performance Computing Modernization Program ("HPCMP")) (*id.*).   The license agreement specified that Accelogic could not redistribute the software, allow a contractor or subcontractor to use the software, or assign work or grant access to the software to any non-U.S. person unless pre-approved by HPCMP, and that such pre-approval was limited to U.S. contractors or subcontractors (*id.*).   The license agreement also warned the Defendant that the software was subject to the Arms Export Contract Act or the Export Administration Act of 1979 and violations of those acts would result in criminal penalties (*id.*).

During negotiations with the Missile Defense Agency, the Defendant signed a written certification – that warned him of criminal penalties for false statements – that all research/research and development work would be performed in the United States (*id.* at 13-14).   The Missile Defense Agency specifically informed Gonzalez that one of the employees listed in his proposal, S.F., could not work on the contract because the contract could produce export control information (*id.* at 14).   On the same day, the Defendant responded and stated that he would remove S.F. from the project and have A.H., who was a U.S. citizen, perform the work instead (*id.* at 14).   Despite this promise, A.H. did not perform any research/research and development work on the project and S.F. continued to work as one of the main participants on the project (*id.*).   The Missile Defense Agency also required the Defendant to complete a "Certification Pertaining to Foreign Interests" (*id.*).   In that Certification, the Defendant wrote that Accelogic did "not have any

---

[5] "EAR" refers to the "Export Administration Regulations" that appear at 15 C.F.R. Parts 730 through 799.

contracts, agreements, understandings, arrangements, indebtedness, liabilities or obligations with any other foreign person" (*id.*).   The Defendant further wrote that three individuals, including J.P., "provide occasional hourly-based consulting to Accelogic on advanced technical aspects" but stated that none of those individuals – including J.P. – would work on the project with Missile Defense Agency (*id.*).   The Defendant did not disclose that J.P. owned and worked for Merida Tech, a business located in Venezuela, and that Merida Tech would, in fact, work on activities that would support the MDA project (*id.*).

The contract with the Missile Defense Agency also contained a provision stating that distribution of any technical documents (which was defined to include recorded information and software that conveyed scientific and technical information and technical data) prepared under the SBIR contract, in any state of development or completion, was prohibited outside of the contractor (*i.e.*, Accelogic) and applicable subcontractors under the contract unless authorized by the Contracting Officer in writing.   The contract also required Accelogic to place a written warning on all technical documents that the document contained technical data whose export was restricted by federal law and that violations of the law were subject to severe criminal penalties (*id.*). Despite the Defendant's representations and the specific notifications from Missile Defense Agency regarding the sensitive nature of the project and the prohibitions on involvement of non-U.S. persons and the requirement that all work occur inside the United States, the Defendant involved Merida Tech and J.P. in the project, including but not limited to when the Defendant traveled to Venezuela via Colombia with computer equipment and information about the Missile Defense Agency project to meet with J.P. and other Merida Tech employees and share that information without authorization from the Missile Defense Agency (*id.* at 14-15).

When notifying the Defendant of Accelogic's selection for its project, the Defense Advanced Research Projections Agency reminded Gonzalez that "the International Traffic in Arms Regulations (ITAR), 22 CFR Parts 120 through 130, and the Export Administration Regulations (EAR), 15 CFR Parts 730 through 799, will apply to all projects with military or dual-use applications that develop beyond fundamental research . . . If use of foreign citizens has been proposed, you must be able to specify their country of origin, the type of visa or work permit under which they are performing and an explanation of their anticipated level of involvement on this project" (*id.* at 15). The contract specified that prior approval from the Contracting Officer was required before using any foreign national as an employee or a subcontractor to do any work on the contract and required prior approval from the agency before Accelogic could disclose or publish any information developed under the contract (*id.*). The contract explicitly stated Accelogic's obligations with regard to the U.S. export control laws and regulations, including ITAR and EAR (*id.*). During the contract negotiations, the Defendant confirmed that all work on the contract would be performed inside the United States at Accelogic's business premises and in accordance with the Statement of Work contained in Accelogic's proposal (*id.*).

With regard to the NASA contract, Accelogic was required to confirm that all work would take place inside the United States; to disclose all subcontractors and consultants who would work on the contract; and to confirm that the contract would be performed in accordance with ITAR export control regulations (*id.* at 16). The Defendant, on behalf of Accelogic, confirmed that all R&D work would take place at Accelogic's business premises and in accordance with ITAR export control regulations (*id.*). And the Defendant, on behalf of Accelogic, disclosed several consultants, but made no mention of Merida Tech, its owner, J.P., or any of its employees (*id.*). To conduct its work, Accelogic requested access to NASA's CART3D, FUN3D, and

8

TetrUSS/USM3D software code, and NASA granted permission subject to the required software usage agreements (*id.*). The Defendant signed a series of software confidentiality agreements to get access to the programs, all of which specified: (1) that the software could only be made available to Accelogic employees and could not be distributed further without NASA's express written approval; and (2) in bold text, that the software was intended for domestic use only and "shall not" be made available to anyone outside of the United States; and (3) in bold text, that the software "shall not" be made available to foreign persons (*id.* at 17).

Thus, in connection with the performance of each of the contracts, the Defendant was made aware, through written agreements and warnings, that non-U.S. persons could not access government agency information on government computers, including government remote data storage facilities (*id.*). The non-U.S. persons with whom the Defendant was working, that is, R.N., S.F., and the owner and employees of Merida Tech, also were aware that they were not authorized to access the government agency information and the government computers, including government data storage facilities (*id.* at 17-18). Despite this knowledge, the Defendant aided and abetted R.N., S.F., and the Merida Tech owner and employees to intentionally access government secure file-sharing systems and software without authorization, including Cart-p, MDA's technical data and datasets, DARPA's datasets and graph data structures, NASA's software, including CART3D, FUN3D, and TetrUSS/USM3D; and to perform research and development, including testing and implementation of the Graphic User Interfaces (GUI interfaces) for the barebones and fully-featured prototypes; creation of performance and validation reports that required running the government software; work on implementing the software for optimizing the NPB-CG benchmark testing; and running experiments to characterize the performance of the software (*id.* at 18). The experiments and tests done by Merida Tech

personnel were conducted in Venezuela, not on Accelogic's premises, by persons who were not disclosed to or approved by any of the government agencies (*id.*).

By using the engineers in Venezuela and the engineers at Accelogic who were non-U.S. persons, the Defendant received a commercial advantage and private financial gain (*id.*).   They performed the work at a lower cost than authorized engineers in the United States – including those persons that the Defendant had told the agencies would be working on the contracts (*id.*).

On June 22, 2022, Defendant Gonzalez entered his guilty plea to the charge of aiding and abetting intrusion of a government computer, pursuant to a plea agreement and written factual proffer, before Magistrate Judge Reinhart (DE15; DE16).   On the same day, Accelogic and Intellep entered their guilty pleas to conspiring with Gonzalez and others to commit wire fraud, also pursuant to plea agreements and written factual proffers.   Those factual proffers set out details of how the proposals submitted to obtain the contracts listed above, and additional contracts with the Air Force and the Department of Energy, contained additional false statements regarding who would be performing the work on the contracts and Accelogic's ability to commercialize its products.   Those additional facts are summarized in Gonzalez's PSI.

Neither party filed any objection to the Magistrate Judge's Report and Recommendation, and the Court adopted the Report and Recommendation on July 18, 2022 (DE 22).   The matter is set for sentencing on September 9, 2022.   Both parties filed Objections to the Pre-Sentence Investigation Report (DE 24, DE 25), and Defendant Gonzalez has also filed two versions of a Sentencing Memorandum seeking a non-custodial sentence (DE 28, DE 29).

## ARGUMENT

As noted in the Revised PSI, Gonzalez's advisory guideline range is 46 to 57 months' imprisonment, to be followed by one to three years' supervised release (Rev. PSI

at ¶¶ 169, 171).[6]   The statutory maximum sentence is five years' imprisonment (*id.* at ¶ 168).   Under the guidelines, a sentence of probation is not authorized, but it is authorized by statute (*id.* at ¶¶ 173, 174).   Gonzalez asks the Court to impose a below-guideline sentence and to impose a sentence of probation or home confinement rather than incarceration based upon his view of the nature, circumstances, and seriousness of the offense, his history and characteristics, and the need to avoid unwarranted sentencing disparities.   For the reasons set forth below, the United States opposes his request.

Pursuant to 18 U.S.C. § 3553(a), the Court shall consider the following factors, *inter alia*, in imposing a sentence:

- the nature and circumstances of the offense and the history and characteristics of the defendant;

- the need for the sentence imposed—

  o to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

  o to afford adequate deterrence to criminal conduct;

  o to protect the public from further crimes of the defendant; and

  o to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

- the kinds of sentences available;

- the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

---

[6] If the Court declines to apply either of the two-level enhancements in U.S.S.G. § 2B1.1(b)(10) ("(B) a substantial part of a fraudulent scheme was committed from outside the United States" or "(C) the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means"), then the advisory guideline range would be 37 to 46 months' imprisonment with the same range of supervised release.

### 1.   The Nature and Circumstances of the Offense

Gonzalez significantly underrepresents the seriousness of his offense, treating this, in his words, as "garden-variety type of misrepresentation" (DE26 at 3).   He asks the Court to focus on the financial benefit to the government from his work on a contract that occurred *after* he was already aware of the investigation; that is not charged as part of his offense of conviction or Accelogic's offense of conviction; and that did not involve the use of foreign workers.   If the Court instead looks at the nature and circumstances of the crime of conviction, the seriousness is clear.

As explained above, the defendant aided, abetted, counseled, and procured non-U.S. persons to gain access to government computers and confidential data for purposes of private financial gain and commercial advantage.   These non-U.S. persons included Accelogic employees who were in the U.S. on H1B visas sponsored by Accelogic and the owner and employees of Merida Tech located in Venezuela.   Those individuals—who consisted of a professor and students at the main technical *public* university in Venezuela—were allowed access to the information—despite numerous warnings about ITAR, EAR, and software license agreements—because Gonzalez lied to the military agencies and NASA about who would be working on the contracts.   Based on those lies, Accelogic was awarded the contracts—instead of other U.S. businesses—and the sensitive software and data was shared with Gonzalez who then gave unauthorized access to the non-U.S. persons.

Gonzalez suggests that the loss calculation overstates the seriousness of the offense, but neglects to inform the Court that the loss calculation was specifically negotiated because of the parties' understanding that loss can be difficult to calculate in some fraud cases and that only a reasonable estimate of the loss is required under the Guidelines.   U.S.S.G. § 2B1.1, N. 3(C).   In

12

fact, the Guidelines have a special rule for calculation of loss in 18 U.S.C. § 1030, which states that "actual loss includes the following pecuniary harm, regardless of whether such pecuniary harm was reasonably foreseeable:   any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment,[7] and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other damages incurred because of the interruption of service."   U.S.S.G. § 2B1.1, N. 3(A)(v)(III).

Recognizing that a "reasonable estimate of the loss amount is appropriate because 'often the amount of loss caused by fraud is difficult to determine accurately,'" *United States v. Medina*, 485 F.3d 1291, 1304 (11th Cir. 2007) (quoting *United States v. Miller*, 188 F.3d 1312, 1317 (11th Cir.1999)), the parties agreed to use the loss figure of the amount of money actually paid to Accelogic on the contracts where there is firm evidence that confidential government information was given to non-U.S. persons.   Indeed, if the loss had included every contract where Accelogic used non-U.S. persons or performed work overseas, or every contract that was obtained through false statements, the loss figure would be much higher.   (Gov't Exhibits 1, 2, 3, 6).

Gonzalez suggests that conducting work overseas was simply "cutting corners," unimportant, and a miniscule part of the scheme, which is factually incorrect.   Gonzalez traveled to Venezuela to meet with the Merida Tech; he had frequent virtual meetings with them that were transcribed; and he went so far as to create a "point system" for the Merida Tech employees that awarded points based upon assignments.   (Gov't Exhibit 7).   The employee who had the most points at the end of the period won a vacation, with Gonzalez and the owner of Merida Tech as two of the fellow travelers.   All of that work occurred in Venezuela.   And the unlawful

---

[7] Damage assessment was attempted by some agencies but, because Gonzalez physically took some computer equipment to Venezuela and shared other information via file-sharing programs, they were deemed inconclusive.

disclosures also occurred with Accelogic employees who were non-U.S. persons.   Gonzalez was so blatant, that, even when asked directly to remove one of those employees, Gonzalez specifically told the Missile Defense Agency that the employee would be removed and replaced with his wife, A.H. (DE 16 at 13-14).   Gonzalez did not replace the employee that the Missile Defense Agency objected to, and Gonzalez knew that A.H. would not perform the work (*id.*).   When specifically asked to disclose all foreign contacts, Gonzalez again directly lied about the relationship between Accelogic and Merida Tech (*id.* at 14).

The financial advantage to Gonzalez came from using engineers in Venezuela at a fraction of the cost of engineers here, and using non-U.S. person employees that Gonzalez forced to work for more than twelve hours per day, because their visas were tied to their employment with Accelogic.   As shown in Exhibit 4, the highest number of employees that Accelogic ever declared to the Florida Department of Revenue was four.   Gonzalez never had more than two other engineers working with him, according to what he told the State of Florida.   All of the extra funds – from amounts that the Agencies awarded to pay to non-existent U.S. based Accelogic employees, went into Accelogic's coffers.   Some of that money was spent on the engineers in Venezuela, where, in 2021, the minimum wage per month was $2.40 and the average monthly salary for professionals and technicians is around $100 (*see* Exhibit 8).   So the statement in Gonzalez's sentencing memo that the amount of work done in Venezuela had to be minimal because only $40,000 is accounted for, is turned on its head.   $40,000 is a huge sum in Venezuela that paid for multiple engineers working a significant amount of hours, but it cost Gonzalez and Accelogic very little.

Gonzalez characterizes this excess of funds as being "reinvested" into Accelogic, but he neglects to point out that the vast majority of what went in to Accelogic went back out to Gonzalez

as salary and profit-sharing for himself and his wife.   Gonzalez's analyst says that Gonzalez and

his wife were paid what the contracts allowed, but the analyst clearly did not know that Hernandez

has admitted that she never did any substantive work on any of the contracts, and her "salary"

payments dwarf what was paid to the three engineers who, with Gonzalez, produced most of the

work done on the contracts (*see, e.g.,* Exhibit 5).

Lastly, Gonzalez argues that the government received a benefit from his work, so no harm,

no foul.   While it is true that an employee of the contractor that runs Brookhaven National

Laboratory—someone whose name will be on any successful publications of that work—has stated

that the government will potentially have huge cost savings, that relates to one contract that isn't

charged or included as part of the loss calculation.   The glowing reports in the letters from the

government agencies should be taken with a grain of salt, since it seems that Gonzalez was

responsible for much of the glowing language (*cf.* Gov't Exhibit 11 with Def. Ex. H).   Looking at

the five contracts that Gonzalez was charged with, he failed to mention that three were never

finished by Gonzalez, even after granted extensions by the government agencies. [8]   So the

government paid for Gonzalez to perform "research" that never resulted in a final report or final

product.   As explained by DARPA's Chief of its Acquisition Management Branch:

> The Department of the Interior (DOI) awarded contract D17PC00012 to Accelogic
> on behalf of DARPA on October 26, 2016 and the period of performance for this
> contract ended on May 25, 2021.[[9]]   The last report submitted by Accelogic under
> this contract was the Quarter 7 (Q7) progress report, submitted on September 4,
> 2018 and Accelogic did not submit any subsequent reports, to include the final
> report prior to the end of the period of performance as required by the contract. In

---

[8] This failure to finish was caused, no doubt, by Gonzalez failing to hire the consultants and
additional employees that the proposals promised would be used.   Accelogic's failure to complete its
contracts was not limited to the three charged in Gonzalez's Information (DARPA, MDA, and NASA
NNX16CA11C), one of the contracts charged only in the Accelogic Information also was never completed
(Army W911W6-17-C-0026).   Several other contracts that Accelogic promised to complete were never
finished.

[9] This included several extensions of time granted by DARPA.   The original proposal and contract
specified that the project be completed by November 2018.

15

conclusion, Accelogic did NOT meet the terms and conditions of contract D17PC00012 and restitution should be provided to DARPA accordingly (Exhibit 9).

The Department of Energy also submitted an Economic Impact Statement, writing:

DOE seeks restitution for the full amount of the SBIR Phase I award, $153,218.00, from Accelogic LLC, in particular Dr. Juan Gonzalez, for the fraud committed under the award. This will permit DOE to fund a future meritorious SBIR/Small Business Technology Transfer (STTR) applicant. DOE respectfully requests that the Court determine an amount of the Phase I award in restitution from Dr. Gonzalez, if restitution is divided amongst co-defendants, for the role he had in defrauding DOE's SBIR/STTR Programs.

Every DOE SBIR/STTR awardee must submit a final technical report, and progress reports, to allow DOE to validate that the small business awardee completed the research and development work that was proposed in the application funded by DOE. Because it will be public knowledge that Accelogic LLC and Dr. Gonzalez pled guilty to fraud on the award, the scientific credibility of any final technical report concerning the award is suspect. Even if a technical report were to be made publicly available, after any period of data rights to Accelogic LLC, the public may not be able to trust that the reported research was completed or that the results are truthful.

DOE understands that statements were given by scientists in support of Dr. Gonzalez and Accelogic LLC, to continue the research of DOE's Phase I award, and the statements hindered the Government's ability to incorporate the DOE Phase II award into the Plea Agreement. However, in cases involving fraud in SBIR STTR awards, it is the DOE Office of Science's practice to not continue or issue a Phase II award if the Phase I award was obtained by or involved fraud, because there is no legal basis to issue the Phase II award. Since becoming aware of the Plea Agreement and Dr. Gonzalez's bail conditions, (Dr. Gonzalez may not work on Government contracts), the DOE Office of Science terminated the remaining portion of the Phase II award (Exhibit 10).

The harm to the government's programs and reputation, as well as the inability of other law-abiding U.S. companies to receive these grants was not outweighed by the work that Gonzalez did perform.   The loss amount that the parties agreed to is a fair estimate of losses suffered by the victims of Gonzalez's offense.   This factor weighs overwhelmingly in favor of a sentence within the advisory guideline range.

16

## 2. The History and Characteristics of the Defendant/Specific Deterrence

Gonzalez asks the Court to consider his history and characteristics, in particular his lack of any prior arrests, education, family situation, and the effect that the conviction will have on his ability to work, to warrant a 46-month downward departure to a non-custodial sentence.   The government respectfully suggests that Dr. Gonzalez's abilities and situation weigh in the opposite direction – he had no reason to engage in the multi-year, multi-contract computer intrusion and fraud that he committed.   Dr. Gonzalez is a person with an unlimited ability to succeed without engaging in criminal conduct.

As made evident by the defendant's sentencing memorandum, Dr. Gonzalez is a brilliant and accomplished mathematician and engineer.   He moved to the United States on a scholarship to attend the University of Delaware and obtained his Ph.D.   After graduation, Dr. Gonzalez worked for Bell Labs before deciding to open his own business.   Throughout this time, Dr. Gonzalez stayed in the country on a student visa and then an Alien of Extraordinary Ability worker visa.   In support of his petition, as proof of his "extraordinary ability" and the benefit he would bring to the United States, Dr. Gonzalez bragged about being awarded an SBIR contract.   He attached information about the SBIR program, including the following description:

> SBIR is a highly competitive program that encourages small business to explore their technological potential and provides the incentive to profit from its commercialization.   By including qualified small businesses in the nation's R&D arena, high-tech innovation is stimulated and the United States gains entrepreneurial spirit as it meets its specific research and development needs.   . . . SBIR funds the critical startup and development stages and it encourages the commercialization of the technology, product, or service, which, in turn, stimulates the U.S. economy. . . .
>
> SBIR Qualifications:
>
> Small businesses must meet certain eligibility criteria to participate in the SBIR program.

- American-owned and independently operated (Exhibit 12 at 10).

He also attached the Department of Defense's ("DoD's") description of the SBIR program, which makes clear:

To participate in the SBIR program:

- a firm must be a U.S. for-profit small business of 500 or fewer employees
- work must be performed in the United States . . . (Exhibit 12 at 11)

In addition to dispelling any claim the defendant was somehow ignorant of the purposes or rules of the SBIR program, the defendant's visa application shows two of his prime characteristics: (1) his belief that he is "special" and should be treated differently/better than others;[10] and (2) his willingness to use the rules of the SBIR program when it suits him and disregard them when it does not.   These two characteristics weigh in favor of a 46-month term of imprisonment.

The defendant's actions show a belief that his education and talents should free him from following a number of rules – including SBIR and STTR rules and software licensing agreement restrictions.   Every time Dr. Gonzalez signed a Certification stating that all work would be performed in the United States at Accelogic's facility by U.S. persons, he consciously decided that the rules did not apply to him.   Every time Dr. Gonzalez shared access to government computers, information, and software with non-U.S. persons, he consciously decided that the rules did not apply to him.   Every time he drafted a letter to make it appear that Intellep was separate from Accelogic, he consciously decided that the rules did not apply to him.   Every time Dr. Gonzalez solicited letters from consultants, promising he would pay for their expertise in working on the contract and used their CVs to bolster his proposals and win the contracts, Dr. Gonzalez decided

---

[10]  *See, e.g.,* DE 28 at 18, n.17, where the defendant argues "Given Dr. Gonzalez's unique talents, the fact that he was actually working twice the hours he was budgeted to work not only did not prejudice the government, it should be considered a benefit."   As noted in this Response, there was no benefit because, in many instances, Accelogic never finished the work it promised.

his well-being mattered more than theirs.    Dr. Gonzalez states that he has never been arrested, but the course of conduct in this case was not a single instance, it was repeated instances of making overtly false and fraudulent statements—signed with warnings of possible prosecution—over the course of years and to multiple agencies.    These types of defendants have a high likelihood of reoffending.

When someone truly accepts responsibility for his actions, acknowledges that the rules *do* apply to him, and that his actions harmed others, then one can see a possibility of a future law-abiding life.    But Gonzalez's sentencing memorandum shows no such reflection and acceptance – it argues the opposite.

First, he repeatedly argues that, because of his special skills, he should not be imprisoned. Second, he spends literally dozens of pages arguing that, because one of his projects – one that he worked on after he knew he was under investigation – will potentially result in savings to the government, all of his security violations and lies should be disregarded.    Third, he argues that taking the government funds that he obtained through fraud, using them to underpay engineers at Accelogic and in Venezuela and overpaying himself and his wife via salaries and profit-sharing, funneling $2.75 million of those funds through their personal bank accounts to Intellep accounts and then back to Accelogic bank accounts where they could continue to be paid back to himself and his wife as salaries and profit-sharing was all an "investment."    Fourth, he characterizes these hundreds of lies across dozens of proposals, certifications, reports, and letters as merely "cutting corners" and "garden-variety" misrepresentations.    Fifth, he asks the Court for an order allowing him to continue working for government contracts and tells the Court that the government contracts are still "open" and available for him to complete.

All of these examples directly contradict the defendant's bod statement that he will not re-offend.   While administrative debarment may protect certain government agencies from Gonzalez committing the exact same crime, it is not a punishment, and it will not prevent Gonzalez from "cutting corners" in another context.

Quite simply, a 46-month sentence is needed to deter the defendant from committing other offenses and to protect the public from those offenses during his period of incarceration.

> ### 3.   Seriousness of the Offense/Promote Respect for the Law/Provide Just Punishment/Avoid Sentencing Disparities/Afford Adequate Deterrence

All of these factors weigh heavily in favor of a guideline sentence.   As explained above, Gonzalez's offense was extremely serious, and had a deleterious effect on numerous victims and the community at large.   Gonzalez had substantial financial gain from the offense – gains above and beyond what he will be ordered to pay in restitution.   A minimal sentence will send a message that future defendants can reap millions of dollars in rewards and, if caught, risks only a short prison stay.   Unfortunately, there are many individuals who would be willing to serve a term of home confinement or even a short term of imprisonment if they can gain many millions of dollars. For this reason, the Eleventh Circuit has ruled "general deterrence is an important factor in white collar cases, where the motivation is greed . . . we have set aside sentences of little or no imprisonment because they do not constitute just punishment for the offense, do not promote respect for the law, and will not do much to deter similar criminal activity by others." *United States v. Hayes*, 762 F.3d 1300, 1308 (11th Cir. 2014) (rejecting a non-confinement sentence imposed by the district court following a guilty plea and a 5K motion).

If courts impose lenient sentences in these cases, it would send the message "that would-be white-collar criminals stand to lose little more than a portion of their ill-gotten gains and

practically none of their liberty," and would not provide for general deterrence because "[t]he threat of spending time on probation simply does not, and cannot, provide the same level of deterrence as can the threat of incarceration in a federal penitentiary for a meaningful period of time."  *Id.* at 1310-11.

Gonzalez argues that he should be sentenced extremely leniently because a number of other judges have done so in other SBIR/STTR wire fraud/false statement cases.   The argument should fail for two reasons.   First, this is *not* a wire fraud/false statement case.   Gonzalez was charged with and convicted of procuring the unauthorized access of government computers by non-U.S. persons for financial gain.   Second, those overly-lenient sentences in a number of unreported cases have failed to deter others – as shown by Gonzalez's flagrant disregard for the sanctity of the SBIR program's reliance on the honesty of applicants in deciding what contracts to award.

In cases charging violations of 18 U.S.C. § 1030(a)(2), cases in the Circuit Courts of Appeals uniformly have found that sentences within *and above* the advisory guideline range are reasonable.  *See United States v. Rodriguez*, 628 F.3d 1258 (11th Cir. 2010) (affirming upward variance to 12 months' imprisonment and 12 months' supervised release on misdemeanor charges of unauthorized access to a government computer, with no financial incentive, where 54-year-old defendant had no criminal history and had already lost his job because of his actions, because upward variance from 6 months to 12 months was "necessary to reflect the seriousness of the offense, promote respect for the law, and protect the public from future criminal conduct by the defendant . . . based on the number of victims and the extensive nature of [the defendant's] unauthorized access."); *United States v. Eubanks*, 753 F. App'x 806 (11th Cir. 2018) (affirming 84-month within-guidelines sentence for defendant who unlawfully accessed computer systems of former employer to erase files and obtain credit card information to make unauthorized purchases

despite the defendant's lack of criminal history and his computer skills because his actions "were not isolated or spur-of-the-moment offenses, but instead had required deliberate planning and preparation over a period of time); *United States v. Patel*, 400 F. App'x 426 (11th Cir. 2010) (affirming a 40-month sentence (downward variance from 51-63 months) where defendant was convicted of felony visa fraud and misdemeanor computer intrusion for unlawfully accessing the government TECS database to run the defendant's own name and that of a potential employee based on district court's determination that such a sentence was necessary to meet the sentencing goals of punishment and general deterrence and considering the financial, emotional, and psychological hardships to the defendant's family); *United States v. Volynskiy*, 431 F. App'x 8 (2d Cir. 2011) (affirming low-end sentence of 37 months' imprisonment for accessing a protected (bank) computer in connection with credit card fraud scheme because of the serious nature of the crime, the defendant's long involvement in the scheme, and the need for general deterrence of international hackers);  *United States v. Feigin*, 365 F. App'x 180 (11th Cir. 2010) (approving above-guideline sentence where defendant secretly installed computer program to control the webcam on a female's computer and sold images of her in various stages of undress); *United States v. Snowden*, 806 F.3d 1030 (10th Cir. 2015) (affirming an above-guideline sentence where defendant stole competitor's confidential information, due to egregious conduct where the defendant "knew what he was doing was wrong"; gained an unfair competitive advantage over his competitor; and does not respect the law).  *See also United States v. Bogdanov*, 2021 WL 5084003 *4 (E.D.N.Y. Nov. 2, 2021) (Denying compassionate release to defendant sentenced to 60 months' imprisonment for unauthorized computer intrusions for accessing the computer networks of three tax preparation firms using stolen credentials of an authorized user and changing the tax filings to route the tax returns to his own account.   "Even assuming Bogdanov has shown extraordinary and

compelling circumstances warranting release . . . his conduct was 'gravely serious,' involving active participation in multiple schemes across multiple years that helped generate nearly two million dollars in losses, 'had serious ramifications for the U.S. Department of Treasury and the American public . . .." and allowing him to be released after 37 months "would not adequately 'reflect the seriousness of the offense, . . . promote respect for the law, [or] . . . provide[] just punishment for the offense." (brackets in original)).

These cases show that the government's recommendation of a guideline sentence would *not* result in an unwarranted sentence disparity between the defendant and others convicted of similar offenses.

Rather than bring these cases to the Court's attention, Gonzalez relies on fraud convictions where the judges varied downward significantly.  Even considering those cases, imposing a within-guideline sentence would not result in an "unwarranted" sentencing disparity, because, unlike in those cases, Gonzalez was convicted of 18 U.S.C. § 1030(a)(2) for aiding and abetting others to access computers of government agencies involved in the national defense for commercial advantage and private financial gain.

Furthermore, the downward variances in those cases failed to deter others, including Gonzalez.  The Eleventh Circuit has written about the need for general deterrence in white collar cases like the one at hand.  The Eleventh Circuit rejected a significant downward variance, complaining that the health care fraud defendant who stole nearly $3 million:

> did not receive so much as a slap on the wrist – it was more like a soft pat.   . . . Such a sentence fails to achieve an important goal of sentencing in a white collar crime prosecution – the need for general deterrence.   . . .
>
> Insurance companies must rely on the honesty and integrity of medical practitioners in making diagnoses and billing for their services.   And as the government indicated at oral argument, deterrence is an important factor in the sentencing calculus because health care fraud is so rampant that the government lacks the

resources to reach it all.   Thus, when the government obtains a conviction in a health care fraud prosecution, one of the primary objectives of the sentence is to send a message to other health care providers that billing fraud is a serious crime that carries with it a correspondingly serious punishment.

. . . Kuhlman's sentence sends the opposite message—it encourages rather than discourages health care providers from engaging in the commission of health care fraud because they might conclude that the only penalties they will face if they are caught are disgorgement and community service. . . .

"[T]he Congress that adopted the § 3553 sentencing factors emphasized the critical deterrent value of imprisoning serious white-collar criminals, even where those criminals might themselves be unlikely to commit another offense."   We stated that "because economic and fraud-based crimes are more rational, cool and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence."   Our basis for this determination was that "defendants in white-collar crimes often calculate the financial gain and risk of loss, and white-collar crime therefore can be affected and reduced with serious punishment."

*United States v. Kuhlman*, 711 F.3d 1321, 1328-29 (11th Cir. 2013) (brackets omitted).

While Gonzalez was not convicted of health care fraud, the Eleventh Circuit's reasoning in *Kuhlman* applies equally to this case, where the government agencies "must rely on the honesty and integrity of [SBIR applicants]" in deciding what proposals to accept.

Lastly, the Eleventh Circuit recently addressed and rejected many of the other arguments raised by Gonzalez, such as that a lenient sentence is appropriate because "Dr. Gonzalez has already paid an enormous price for his conduct" by losing his business and "sterling reputation" (DE 28 at 39).   In *United States v. Howard*, 28 F.4th 180 (11th Cir. 2022), the Eleventh Circuit vacated a sentence for a doctor convicted of defrauding Tricare that varied downward from a range of 78 to 97 months to "no imprisonment at all, only 36 months of probation, with one year to be served in home detention."   *Id.* at 187.   The Court of Appeals noted the factors relied upon by the district judge, including that the defendant had "presented more than 50 letters to the judge from relatives, friends, colleagues, and acquaintances who attested to her good personal history,

24

kind acts, and many virtues.  . . . [And the defendant] pleaded with the court that her elderly mother, her daughter, and her husband needed her around to care for them." *Id.* at 202.  The district court stated that there was no need to deter the defendant, despite her long-term involvement in the crime of conviction because it was "aberrant behavior from the way you've lived your life," and there was no need for general deterrence because "a physician who is involved in this particular type of crime who loses their license and becomes a felon, if they're going to choose to follow that path, then no sentence [the court] impose[s] will deter them." *Id.* at 203, 204.

The Eleventh Circuit soundly rejected all of these reasons, writing that "looking at sentencing decisions through the prism of discretion is not the same thing as turning a blind eye to unreasonable one." *Id.* at 205.  The Court began by finding that the probationary sentence did not reflect the seriousness of the offense, promote respect for the law, or provide just punishment. *Id.* at 206-08.   Next, the Court specifically rejected the notion that losing one's license and, hence, livelihood is sufficient punishment to warrant a downward variance to a non-custodial sentence. *Id.* at 208-10.   The Court noted that discounting the need for imprisonment when the defendant loses status, like a professional license, upon conviction means that only the class of defendants with those types of educations and financial backgrounds to lose benefit from such a discount. Instead, the Court noted its past encouragement to sentencing judges to keep in mind that criminals "'who have the education and training that enables people to make a decent living without resorting to crime are more rather than less culpable than their desperately poor and deprived brethren in crime.'"  *Id.* at 210 (quoting *Kuhlman,* 741 F.3d at 1329).

Specifically addressing general deterrence, the Eleventh Circuit re-iterated its mantra that "[g]eneral deterrence is more apt, not less apt, in white collar crime cases.  . . . Leniency

undermines general deterrence, and the extreme leniency of a probation sentence undermines it extremely.  It sends the wrong message and sends it loudly and clearly." *Id.* at 209 (citing *Kuhlman*, 711 F.3d at 1339).

The Court also found that the defendant's status as "a convicted felon going forward" – an argument made by Gonzalez – was not a basis for a downward variance.  "The problem with using felon status to support a downward variance is that all but a tiny percentage of those to whom the sentencing guidelines are applied will be 'a convicted felon going forward.'  . . . A factor that exists in more than nineteen out of twenty cases is not a proper basis for varying upward or downward from the guidelines range.  It is just an expected, ordinary, everyday fact of life for defendants sentenced under the guidelines." *Id.* at 215.

The Court rejected the sentencing court's heavy reliance on the fact that the defendant had no prior criminal history – again, one of the reasons Gonzalez has proposed for a non-custodial sentence.  A "lack of criminal history ha[s] already been factored into [the defendant's] criminal history score, which resulted in a lower guidelines range than if she had a criminal history." *Id.* at 223 (citation omitted).  Similarly, the Court rejected the notion that the defendant's lack of criminal history meant that her criminal activity was aberrant or that she was an otherwise law-abiding person.  Noting the length of her involvement in the scheme – writing 394 fraudulent prescriptions over 14 months – was "repetitive, repetitive conduct" and "ceased being aberrant and became normal for her, part of her way of life, a regular source of income" and only stopped because of a change in Tricare policy, not a change of heart.   All of those factors left the Eleventh Circuit to conclude that the sentence was substantively unreasonable.

Gonzalez is seeking a downward variance from 41 months to probation – a major variance that requires a significant justification.   The justifications he has put forward fail.   As in *Howard*,

the letters from family and friends and the defendant's lack of prior convictions are outweighed by his involvement in aiding and abetting computer intrusion for many years and his involvement in Accelogic's fraud for over a decade.   Being a convicted felon is caused by being convicted of a felony – the Eleventh Circuit has rejected any assertion that the status warrants a downward variance of any amount.   And Gonzalez's special status as an accomplished mathematician and scientist weighs in favor of a harsher sentence, not a more lenient one because he had all of the skills and degrees needed to succeed financially and intellectually without resorting to fraud.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court reject the Defendant's request for a downward variance and sentence him to 41 months' imprisonment followed by a two-year term of supervised release, and order restitution and forfeiture.

Respectfully submitted,

JUAN ANTONIO GONZALEZ
UNITED STATES ATTORNEY

By:   s/ *A. Marie Villafaña*
_____
A. MARIE VILLAFAÑA
ASSISTANT UNITED STATES ATTORNEY
Florida Bar No. 0018255
500 S. Australian Avenue, Suite 400
West Palm Beach, FL 33401-6235
Tel:   (561) 820-8711/Fax:   (561) 820-8777
Ann.Marie.Villafana@usdoj.gov

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 8, 2022, I electronically filed the foregoing document with the Clerk of the Court and served the document upon counsel for the defendant and the U.S. Probation Office using CM/ECF.

s/ *A. Marie Villafaña*
_____
A. MARIE VILLAFAÑA
Assistant United States Attorney